**MICHIGAN WISCONSIN PIPE LINE CO., Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

**No. 13451.**

United States Court of Appeals
Sixth Circuit.

Feb. 17, 1959.

554

Charles V. Shannon, Washington, D. C., Richard F. Generelly, May, Shannon & Morley, Washington, D. C., John Dern, Arthur R. Seder, Jr., Sidley, Austin, Burgess & Smith, Chicago, Ill., Wilber H. Mack, Detroit, Mich., on the brief, for petitioner.

Howard E. Wahrenbrock, Washington, D. C., Willard W. Gatchell, and Abraham R. Spalter, Washington, D. C., on the brief, for respondent.

Nathaniel H. Goldstick, and Robert Reese, Detroit, Mich., for City of Detroit, intervener-respondent.

Paul L. Adams, Samuel J. Torina, Robert A. Derengoski, Lansing, Mich., for Mich. Public Service Commission, intervener.

Before SIMONS and MILLER, Circuit Judges, and THORNTON, District Judge.

SHACKELFORD MILLER, Jr., Circuit Judge.

The petitioner, Michigan Wisconsin Pipe Line Co., proceeding under the provisions of Sec. 19(b) of the Natural Gas Act, seeks to review and set aside an order of the Federal Power Commission issued on October 15, 1957, by which the Commission disallowed in its entirety an increase in the rate which petitioner charged for natural gas during the period from April 1, 1955, to November 15, 1956, and required petitioner to refund the amount which it collected from its customers by reason of such increased rate. Sec. 717r(b), Title 15 U.S.C.A.

Petitioner owns and operates an interstate pipeline through which it transports natural gas from Hugoton Field in Texas, and sells such gas to utility customers for resale in numerous communities in Iowa, Missouri, Wisconsin and Michigan. As a part of its system, it operated four underground storage fields under lease from the Michigan Consolidated Gas Co. The rates which petitioner charges in selling gas in interstate commerce for resale are subject to regulation by the Commission under the Natural Gas Act. Sec. 717 through 717 w, Title 15 U.S.C.A.

On November 29, 1954, the Commission in proceedings designated as docket Nos. G–1678 and G–1996, entered an order by which it allowed petitioner a rate of 31.6 cents per Mcf. Mcf represents 1,000 cubic feet of natural gas. In making that determination, the Commission

included in petitioner's cost of service the cost of gas purchased from Phillips Petroleum Co. After the allowance of this rate Phillips filed new rates with the Commission, effective February 1, 1955, which increased the cost of gas to petitioner by $1,522,721.00 per year. On January 25, 1955, the petitioner sought by the present proceeding to increase its rate from 31.6 cents to 32.98 cents per Mcf, which would yield additional revenues of some $1,526,207.00 per annum. In doing so, petitioner contended that the increase would not increase petitioner's earnings but would merely permit petitioner to recover from its customers the additional cost of gas which petitioner would have to pay Phillips commencing on February 1, 1955. By order of February 24, 1955, the Commission provided that a public hearing be held concerning the lawfulness of the proposed rate and suspended petitioner's rate filing until April 1, 1955. On petitioner's motion, filed March 30, 1955, pursuant to Sec. 4(e) of the Act, the proposed increased rate became effective, subject to petitioner's obligation to refund excess charges so collected, if the increased rate should be found invalid. Sec. 717c (e), Title 15 U.S.C.A.

On May 15, 1956, while hearings on the rate filing were in progress, petitioner filed a new rate of 35.75 cents per Mcf, primarily to reflect the increased cost of purchasing and marketing an additional supply of gas obtained from a new supplier, American Louisiana Pipe Line Co. This increase was also suspended by the Commission but subsequently became effective, subject to refund, on November 15, 1956. It is not involved in this proceeding. The 32.98 Mcf rate which is involved in the present proceeding was accordingly in effect for approximately only nineteen months, from April 1, 1955, to November 15, 1956. This period is referred to as the "impoundment period" and the rate of 32.98 cents as a "locked in" rate.

Hearings in the present proceeding were concluded on October 4, 1956. On March 20, 1957, the presiding Examiner rendered his finding that the increase in rates and charges for the period of April 1, 1955, to November 15, 1956, was unjust and unreasonable. He ruled that it should be disallowed and ordered a refund of the excess charges. Following exceptions and oral argument with respect thereto, the Commission on October 15, 1957, modified the Examiner's findings in certain particulars but affirmed his overall disallowance of petitioner's proposed increase from 31.6 cents to 32.98 cents per Mcf for the period involved. It is this ruling which petitioner seeks to review.

■ The permissible rate per Mcf of gas is determined by dividing the total annual cost of service, which includes the allowable return on investment, by the annual sales volume of the system. Accordingly, a utility's earnings are, to a large extent, determined by the volume of its sales. A low volume of sales during the period used as a test period would result in a high rate, while a high volume of sales in that period would result in a lower rate. In order for a just and reasonable rate to be determined, the volume of sales in a test period should be a normal volume, with particular factors leading to an abnormal result being eliminated. West Ohio Gas Co. v. Public Utilities Commission, 294 U.S. 79, 81–82, 55 S.Ct. 324, 79 L.Ed. 773; United Gas Public Service Co. v. State of Texas, 303 U.S. 123, 145, 58 S. Ct. 483, 82 L.Ed. 702.

■ Usually, where a rate filing is made, the Commission undertakes to establish a rate which it believes, by reason of records and estimates, constitutes a just and reasonable rate for the indefinite future. This process involves the use of the statistics of an actual period of twelve months with an estimate of expected sales and expenses for some months into the future. It is sought by this method to develop a statement of costs and revenues for a normal year from which a just and reasonable rate may be derived for future periods. In the present case, however, the rate to be allowed was not for the indefinite future.

It applied only to the impoundment period. If the actual results of operation during such a limited and determinable period are known, it is possible to fix a rate for that period without resort to estimates and without concern for abnormal and non-recurring conditions. On the other hand, if the rate is to apply to the indefinite future, a test period is necessary as a basis for calculation with abnormal conditions eliminated by "normalizing adjustments."

■ In the present case the Examiner rejected the "actual results" approach because in his opinion he considered that the use of the figures for the year 1955 would be a better gauge of the business operations of the company than the use of the actual figures for the nineteen months period. The nineteen months impoundment period included two summers and only one winter, thus including only one strong revenue period (winter months) and two relatively strong cost periods (summer months). The Examiner, accordingly, used a twelve months test period, using the calendar year 1955 as this period. Although petitioner believes that the actual results method was the proper and better method to be used in this proceeding, it does not contend that the Commission erred in using the test period method, provided the test period method was properly applied to the facts of this case. This is the correct analysis of the question. The Commission is not bound to the use of any single formula or combination of formulae in determining rates. "It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important." Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333.

■ Petitioner's main contention on this review is that the Examiner improperly used an abnormal sales volume for the test period of the calendar year 1955, which resulted in a rate lower than it was entitled to if the normal sales volume for the year had been used. It contends that the designed capacity of the pipeline, which was 110,595,000 Mcf per year, should have been used as the normal sales volume. However, during the calendar year 1955 petitioner actually sold 117,066,634 Mcf, which figure was used by the Examiner as the sales volume for the test period. Petitioner contends that this figure represented an abnormally large volume of sales and that under the rule above stated the abnormal factors should have been eliminated.

The reason that the actual sales during the calendar year 1955 were in excess of the designed capacity of the pipeline was the use by petitioner for storage purposes of four depleted natural gas fields in Michigan located at points convenient to its principal markets. During the summer and at other times when consumer demands were low gas transported from Texas was pumped from petitioner's pipeline into these storage fields. Later, during periods of peak demand, large volumes of gas were withdrawn from these storage fields and delivered to the markets to meet winter space heating requirements, thus producing a sales capacity on peak days greater than the daily throughput capacity of the pipeline itself. Although petitioner actually sold 117,066,634 Mcf during the year 1955, this included a net "drawdown" or reduction of 5,829,710 Mcf in the volume of gas in the storage fields. The Examiner recognized these facts but used petitioner's actual sales of 117,066,634 Mcf in 1955 without making any adjustment for this drawdown from storage.

It is petitioner's contention that on the average it cannot sell more gas per year than the annual delivery capacity of its pipeline; that while the storage operation gives it greatly increased ability to meet peak day demands and to supply the gas required during abnormally cold

winters, it does not add a foot of gas to the total that has been transported through the pipeline from the sources of supply in Texas. The Commission contends that in computing sales volume in a particular year it is not limited to the designed capacity of the pipeline, that the petitioner actually sold in the three consecutive years of 1953, 1954 and 1955 gas in excess of its designed capacity, which fact is shown by the record, and that the figure used for the test period year of 1955 was, under the circumstances of this case, the proper figure to use.

If this case involved the determination of a rate for the indefinite future, there would be merit in petitioner's contention. Over a period of consecutive years, petitioner could not sell *on the average* more gas per year than the annual delivery capacity of its pipeline. It is true, as petitioner contends, that the trial Examiner did not find, and the evidence would preclude any finding, that petitioner had a sustained sales capacity of 117,-066,634 Mcf per year or that petitioner could continue indefinitely a net drawdown of 5,829,710 Mcf from storage, since a repetition of such a drawdown in successive years over a period of years would result in a negative storage balance in the following year. But we are not concerned with an average sales volume which would serve as a basis for a rate to be charged subsequent to November 15, 1956. That rate is being determined in another proceeding in which the annual sales volume will be redetermined. In making such redetermination for future rates, the Commission will have before it the then condition of gas in storage which has an effect upon the annual sales volume in subsequent years. We cannot make a ruling in this proceeding based upon the assumption that the Commission in another pending proceeding will not give proper consideration to all the factors which are before it in that proceeding.

In the present case the Examiner used the actual sales volume for the year in question. Considering the overall operations of the petitioner, including the use of its storage facilities, it does not necessarily follow that sales of gas in a certain year in excess of the designed capacity of the pipeline are abnormal in the sense that they must be eliminated in the determination of a proper locked-in rate for a short impounded period. An average sales volume computed for a period of years, necessarily implies that the sales volume in one or more years exceeds the average. Such a result alone does not make it abnormal. The record does not disclose to us the existence of such unusual circumstances in the year 1955 that would require us to classify the sales volume in that year as abnormal. Considering the limited purpose for which the rate will be used in the present proceeding, we are of the opinion that the evidence supports the use by the Examiner of the actual sales volume of 117,066,634 Mcf for the calendar year 1955 and must have our approval. Sec. 19(b), Natural Gas Act; Sec. 717r(b), Title 15 U.S.C.A.; Michigan Consolidated Gas Co. v. Panhandle Eastern Pipe Line Co., 6 Cir., 173 F.2d 784, 788; United States ex rel. Chapman v. Federal Power Commission, 4 Cir., 191 F.2d 796, 808.

■■ Petitioner contends that the only purpose of the proposed rate increase was to offset the increased cost of the gas which it would purchase from Phillips Petroleum Company after February 1, 1955, the effective date of Phillips' increased prices. This increased cost was subsequent to the previous approval of the rate of 31.6 cents per Mcf. Petitioner argues that the undisputed facts show that the increased revenues from the increased rate would be approximately the same as this increased cost. That might have been one approach to the problem which the Commission could have used. But, as pointed out hereinabove, the use of a different formula which was considered more advisable was not error, provided the end result was the fixing of a just and reasonable rate. The order of the Commission must be affirmed unless the petitioner makes

a convincing showing that it is unreasonable in its consequences because the return allowed is insufficient to enable it to meet its expenses of operation, to pay interest on its bonds and dividends on its stock, to maintain its credit and to attract capital, or is clearly out of line with the returns on investments in enterprises involving comparable risks. Panhandle Eastern Pipe Line Co. v. Federal Power Commission, 8 Cir., 143 F.2d 488, 496–497, affirmed 324 U.S. 635, 649–650, 65 S.Ct. 821, 89 L.Ed. 1241. The record shows that the increased rate would approximately offset the increased cost of gas purchased from Phillips, but that is not the test. The record does not show that it was necessary for the petitioner to have the proposed increase in order to have the just and reasonable rate under all the circumstances, to which it was entitled.

Petitioner also contends that the cost of service determined by the Commission for the test period should have included (a) an amount of $75,000.00 representing a regulatory commission expense incident to petitioner's previous rate proceeding, and (b) an additional Federal income tax liability in the amount of $168,701.00 resulting from the retirement of debt in 1955 which in turn decreased the interest deduction for income tax purposes. These amounts were not included in the cost of service. The petitioner also disagrees with the Commission's disallowance of $1,792,516.00 of its $3,660,719.00 net working capital. This disallowance resulted from its computation of petitioner's average investment in gas stored underground, which petitioner contends was based upon an admittedly unrealistic storage program, and by offsetting Federal income tax accruals against petitioner's investment in gas stored underground and in major utility plant replacement parts.

In view of our acceptance of the Commission's determination that 117,066,634 Mcf was not an improper volume of gas sales to be used as a basis for fixing the rate in this case it is unnecessary to discuss the merits of these contentions.

The total of the two cost-of-service items and the amount of $226,327.00, representing the return and related income tax on $1,792,516.00, is $470,028.00. If that total is added to the cost of service used by the Commission, even without giving effect to offsetting contra adjustments, and the figure of 117,066,634 is used as the volume of sales, the resulting unit rate on a 6% return basis is 31.39 cents, which is less than the 31.6 cents rate sought to be increased. Although petitioner seeks a 6¼% return, there is no finding in the present record on that issue. The Examiner and the Commission used for the purposes of this case the 6% return basis previously determined by it to be reasonable for petitioner, which under the present record will not be increased on this review.

The order of the Commission issued October 15, 1957, is affirmed.