POTOMAC ELECTRIC POWER
COMPANY, Petitioner,

v.

The PUBLIC SERVICE COMMISSION of
the District of Columbia, Respondent,
People's Counsel, Intervenor.

No. 10490.

District of Columbia Court of Appeals.

Argued En Banc May 5, 1978.

Decided May 1, 1979.

Carl D. Hobelman, New York City, of the bar of the State of New York, pro hac vice, by special leave of court, with whom Alan G. Kirk II and Lawrence A. Gollomp, Washington, D. C., were on the answer to petitions for rehearing or, in the alternative, rehearing en banc, for petitioner.

John R. Risher, Jr., Corp. Counsel, Washington D. C., at the time the case was argued, with whom Richard W. Barton, Deputy Corporation Counsel, and James T. McManus, Asst. Corp. Counsel, Washington, D. C., were on the petition for rehearing or rehearing en banc, for respondent.

Brian Lederer, Washington, D. C., with whom Elizabeth Noel, Washington, D. C., was on the petition for rehearing or, in the alternative, for rehearing en banc, for intervenor.

Before NEWMAN, Chief Judge, and KELLY, KERN, GALLAGHER, NEBEKER, YEAGLEY, HARRIS, MACK and FERREN, Associate Judges.

YEAGLEY, Associate Judge:

Potomac Electric Power Company (hereinafter Pepco or the Company), petitioned this court, pursuant to D.C.Code 1973, § 43–705, to review two orders of respondent Public Service Commission of the District of Columbia (hereinafter PSC or the Commission); the first, Order No. 5739 of November 19, 1975,* granted Pepco an increase in retail rates of $27,657,000 based on the request of the Company, as amended,

* The Commission's order is reported in 11 P.U.R.4th 215 (PSC D.C.1975).

for an increase in revenues of $50,832,000; the second, Order No. 5750 of January 12, 1976, denied Pepco's petition for reconsideration. On November 9, 1977, a division of the court, with this judge dissenting, held that the increase in revenues authorized by the PSC was so deficient as to be confiscatory and therefore unreasonable, arbitrary and capricious within the meaning of D.C. Code 1973, § 43–706. The orders of the PSC were vacated and the case remanded with instructions to the Commission to base the new rates on Company data for a test year ending June 30, 1975, rather than on a 1974 test year as originally suggested by Pepco and was found to be proper by the Commission, and to revise the rates upward accordingly.[1] It also instructed the Commission to "calculate the revenue losses improperly experienced by Pepco during the period that Order No. 5739 was in effect." By ordering the Commission to accept the 1975 data and to base the new rates thereon, the court deprived the Commission of its right to examine and test the new data at a public hearing and left the Commission little room in which to exercise its discretion to consider the justification, if any, for determining that Pepco revenues should be increased by approximately $50,832,000 instead of the $27,657,000 it had previously authorized. The court order also deprived the PSC of any reasonable opportunity to balance the interests of the consumer. After reargument en banc, we now hold, with the former majority dissenting, that there was no reversible error in the orders of the PSC, and affirm the two orders of the Commission.

## PROCEDURAL HISTORY

The procedural history of this case is long and involved. On December 20, 1974, Pepco filed an application with the Commission based on a 1974 test year seeking an increase in rates for the sale of electrical energy so as to produce an increase in operating revenues of approximately $48,000,-000. Later as more recent 1974 figures became available, it increased its request to $50,832,000. Following a series of postponements and delays,[2] the Commission issued Order No. 5718 on May 20, 1975, granting *inter alia* intervention to 13 parties, one of whom, People's Counsel, is an intervenor on appeal here.[3] The hearings were held from June 4 through July 24, 1975. On July 18, Pepco filed with its rebuttal testimony new data reflecting its operations from January 1 through June 30, 1975. After comparatively brief cross-examination on that data, and no surrebuttal, oral argument was heard by the Commission on the merits of the application and on November 12, 1975, it issued its order finding a 9.1% rate of return would be reasonable and authorizing an increase in the Company's operating revenues in the District of Columbia for the year of $27,657,000, so as to provide an increase in net income of $12,302,000. A dissenting opinion by Commissioner Stratton called for a substantially higher rate base. On December 12, 1975, the Commission approved the new schedule of rates filed by Pepco in accordance with the foregoing order which became effective the following day. A motion for reconsideration was denied on January 12, 1976, and Pepco appealed.

The Commission's action in Order No. 5739 was its fourth decision in six years on applications for rate increases by Pepco. Apparently the reason for filing this re-

1. *Potomac Electric Power Co. v. Public Service Commission*, D.C.App., 380 A.2d 126 (1977).

2. During the pendency of its basic application, Pepco twice sought interim rate increases by applications dated March 12, 1975, and July 3, 1975. Each application was dismissed by the Commission, the first in Order No. 5707, dated April 7, 1975, and the second in Order No. 5725, dated July 11, 1975. Since no appeal was taken from these orders, and as they are not directly challenged here, we have no jurisdic-

tion to modify them. However, they necessarily constitute a part of the history of the Company's appeal to the Commission for relief.

3. The office of the People's Counsel was established by Congress on January 2, 1975. *See* D.C.Code 1975 Supp., § 43–205. Part of the initial delay in this case was occasioned by the desire of the Commission, quite properly, to obtain the views of the People's Counsel, although there was a time lag in establishing that office.

quest so soon after a 1973 increase was the steady decline in Pepco's financial condition in the last half of 1974. The Commission saw two factors as the principal causes of this decline: (1) energy conservation by consumers as urged upon them by the government, interested private organizations and Pepco itself because of the national energy crisis experience that year which resulted in a substantial decrease in the number of kilowatt hours sold at retail by Pepco; and (2) a substantial decrease in the "energy and capacity" sold by Pepco to the Pennsylvania, New Jersey, Maryland (PJM) Interchange Pool, of which Pepco is a member. The Commission found that had these two dramatic changes not occurred, "the need for a rate increase application by PEPCO may very well have been eliminated." Nevertheless, the Commission did not foresee a return to "past normalcy" of the pre-1974 years and thus found it necessary to pursue the lengthy process of adjusting electrical rates to accommodate those two factors and other changed conditions affecting Company operations.

Order No. 5739, which authorized new rates effective December 13, 1975, expired on December 16, 1976, when a new PSC order (No. 5849) authorized an additional $29.4 million in revenues based on another Pepco application filed in December 1975. Those new rates under which the Company now operates were set pursuant to another ratemaking proceeding which followed close on the heels of the instant case.

## ASSERTIONS OF ERROR

The errors advanced by the Company regarding the order appealed from were summarized by the division as follows:

Examination of the elements of the opinion reveals several findings and conclusions (expressed in the Commission's opinion in an overlapping, narrative style) which are unreasonable, arbitrary, or capricious. These include the Commission's refusal to utilize the most recent test period in the record, its failure to account for continuing attrition, and its refusal to recognize certain known changes which

occurred after the originally proposed calendar 1974 test period. [*Potomac Electric Power Co. v. Public Service Commission*, D.C.App., 380 A.2d 126, 132–33 (1977).]

The division held that even though the test year on which the Company based its application was calendar year 1974, it was arbitrary and capricious, and therefore error, for the Commission not to have used as the test year the Company figures revised as of year-end June 30, 1975. The division also concluded that the rates set would deny the Company an opportunity to earn a fair rate of return.

## SCOPE OF REVIEW

■ In approaching petitioner's basic objections we note that the scope of our review of the Commission's final rate order is quite limited. D.C.Code 1973, § 43–706 provides that:

In the determination of any appeal from an order or decision of the Commission the review by the court shall be limited to questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings of the Commission are unreasonable, arbitrary, or capricious.

By this provision Congress vested sole ratemaking authority in the PSC. We are not to substitute our judgment for that of the Commission. Even though we might arrive at a somewhat different decision than did the PSC, if there is substantial evidence to support the Commission's findings and conclusions, we must affirm. *See Williams v. Washington Metropolitan Area Transit Commission*, 134 U.S.App.D.C. 342, 415 F.2d 922 (1968); *Watergate Improvement Associates v. Public Service Commission*, D.C. App., 326 A.2d 778, 783–84 (1974).

The power to make rates was clearly delegated by Congress to the Commission, not to this court. Our review of a utility commission order is the narrowest judicial review in the field of administrative law. K. Davis, Administrative Law of the Seventies § 29.00, at 647 (June 1976); 2 F. Coo-

per, State Administrative Law 756–72 (1965).

We have held that "the scope of our review of the Commission's actions is 'limited to questions of law . . . and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings of the Commission are unreasonable, arbitrary, or capricious.'" *Watergate Improvement Associates v. Public Service Commission, supra* at 783, *quoting* D.C.Code 1973, § 43–706. In an appeal by an intervenor of an earlier Pepco rate increase, Judge Harris, speaking for this court, said:

> Arbitrary action, however, is action not based on facts or reason. . . . The burden upon petitioner is not merely to put forth an acceptable alternative but rather to demonstrate clearly and convincingly a fatal flaw in the action taken. . . . Petitioner has not met that burden. He simply asserts a difference of opinion with the Commission. [*Goodman v. Public Service Commission,* D.C. App., 309 A.2d 97, 101 (1973) (citations omitted).]

Four years ago when some intervenors contested a $12,000,000 rate increase granted the company, this court in resolving the dispute quoted with approval the guiding rule for appellate review of utility agency orders as set forth in *Williams v. Washington Metropolitan Area Transit Commission, supra* 134 U.S.App.D.C. at 362, 415 F.2d at 942:

> Our role as a reviewing court is not to make an independent determination as to whether fares fixed by the Commission are just and reasonable, but rather to insure that the Commission, in exercising its rate-making power, has acted rationally and lawfully. Our function is normally exhausted when we have determined that the Commission has respected procedural requirements, has made findings based on substantial evidence, and has applied the correct legal standards to its substantive deliberations. [*Telephone Users Association v. Public Service Commission,* D.C.App., 304 A.2d 293, 296 (1973), *cert. denied,* 415 U.S. 933, 94 S.Ct. 1448, 39 L.Ed.2d 492 (1974).]

"The court's responsibility is not to supplant the Commission's [balancing] of the [factors involved] with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors." *Permian Basin Area Rate Cases,* 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968).

■ As long as there is substantial evidence to support a reasoned conclusion of the Commission we must affirm. *Watergate Improvement Associates v. Public Service Commission, supra* at 783–84. *See also Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). We review the proceedings and order of the Commission with those guidelines in mind.

### THE TEST YEAR

Ratemaking for a particular utility is, in essence, the making of a forecast of its future financial condition upon the basis of its known performance during a span of time in the immediate past, *viz.,* a "test period." *Telephone Users Association v. Public Service Commission, supra* at 297; *Michigan Wisconsin Pipe Line Co. v. Federal Power Commission,* 263 F.2d 553, 555–56 (6th Cir. 1959). Pepco argues on appeal that since the PSC did not use an amended test year period ending June 30, 1975, in determining its new rates, Pepco will be prevented from realizing an equitable rate of return on its investment.

In that regard we have admonished the Commission in *Telephone Users Association v. Public Service Commission, supra,* wherein the Commission failed to take into consideration the most recent data submitted by the utility, that the most recent available material must be considered and weighed by the Commission in reaching decisions on ratemaking. This is consistent with effective ratemaking policy. If recent operating figures are completely ignored, the new rate will be based on old and perhaps no longer valid data.

The problem becomes more acute when there is a long regulatory lag, as in the instant case where considerable time elapsed between the original request and the final decision. Although this is an inevitable part of the regulatory process where the rights of the company to rate relief must be balanced against the interests of the consumer in a hearing involving a myriad of parties, it is nonetheless important, in fairness to all, that the latest available operating data not be ignored. However, a request to use more recent data submitted in a last minute filing does not present the same situation and is not necessarily a fair or reasonable request. It is to be resolved in the reasonable exercise of the Commission's discretion.[4] We will not reverse and remand the decision here for further hearings and consideration of the more recent data filed under these circumstances. First of all, as will be demonstrated by the record, Pepco did not make clear for any reasonable person to understand at the time it filed the new data that it was taking a position that the PSC must adopt a revised test year. Secondly, the Commission in using a 1974 test year did give weight and consideration to the 1975 data filed by Pepco. We would observe that filing the latest available operating data does not necessarily mandate a change in the test year by the Commission. Rather it should select a test year that appears likely to be representative of the future. *See generally, Interstate Commerce Commission v. City of Jersey City,* 322 U.S. 503, 515, 64 S.Ct. 1129, 88 L.Ed. 1420 (1944).

In the application for a rate increase filed by the Company, it asked that it be based on a 1974 calendar test year and it supplied figures for the first eight months of 1974 augmented with detailed estimates for the remaining four months. As figures for the Company's actual operations for those four months became available they were supplied by the Company. After cross-examination of Company witnesses was completed and as the respondent and intervenors were completing their testimony in opposi-

tion, the Company, on Friday, July 18, 1975, filed proposed rebuttal testimony of its Sr. Vice-Pres.-Finance, with two detailed exhibits which included financial data reflecting for the first time operating results from January 1 through June 30, 1975. (Company Exhibits G and 14.) The witness appeared and testified orally on those figures "in rebuttal" on Wednesday, July 23.

During cross-examination of that witness by counsel for the Commission, the following developed:

Q. Mr. Davis, are you proposing a new test year for the Commission to use in this case?

A. I have indicated in the testimony that we think it is important to place this information on a test year revenue requirement basis before the Commission. *Now we are not—not suggesting a substitution of the June 30 year for the December 31 year,* but I do ask, or do suggest in my rebuttal testimony, and I would ask, that the Commission take note of this information and apply it in reaching the conclusions in this case . . . . [Emphasis supplied.]

The Company relies principally on the testimony of Pepco's President, J. Reid Thompson, who in testifying in rebuttal that same day said: "I would urge the Commission to base its results on the June 30 figures."

However, when Mr. Thompson was cross-examined by People's Counsel, he made an important modification to that position in the following exchange:

Q. . . . You are not suggesting a new period, are you? You still want your end of period rate base considered in this case December, 1974. You are not requesting an amendment of that at this time?

A. I don't want to get bogged down in semantics or play a game.

Q. Well, let's not get bogged down. You are a lawyer. Let's understand—

---

4. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 1217 n. 22, 55 L.Ed.2d 460 (1978).

A. What I am saying to this Commission is trying to arrive at the truth here as to what is a fair and reasonable rate of return. I am suggesting to this Commission that if it can be done in the light of their understanding and their responsibility without delaying this case, without any further opening the record, that they should adopt a June 30 test year. I am suggesting precisely that, *but I am suggesting that, however, if it requires a reopening of the record to lay in a case, that they don't do that.* Rather, grant an additional attrition allowance to take into account June 30 figures. [Emphasis supplied.] [5]

His final position then seems to be clear that the Company was not insisting on a change in the test year, but was urging the Commission in using a 1974 test year to consider that data in light of the more recent June 30 figures. Since the case was filed and tried by all parties on a 1974 test year, it is apparent from the foregoing that President Thompson was necessarily leaving to the discretion of the Commission the decision as to how much weight to give the new data. Mr. Thompson concluded his testimony by saying:

I would urge upon this Commission the urgent necessity for prompt action on the case after it is completed, with the same alacrity with which you have conducted the hearings, Madam Chairperson.

When the hearing was terminated there was no question on the record that 1974 was still the test year. Although the Company believed the Commission should give thorough consideration to the updated figures, any further delay to explore the new data was not acceptable. Accordingly, respondent and intervenors, not having had time to obtain in depth familiarity with the new data, did not cross-examine Mr. Davis in detail on the new information nor did they recall their witnesses to testify regarding their analysis of the updated 1975 figures as would have been their right had the Commission announced that it was adopting a new test year. The testimony of all witnesses of the respondent and of all witnesses for the intervenors had dealt only with the 1974 calendar year data. That is what the first 2,600 pages out of a total of 2,900 pages of testimony were all about. When wholly new data are furnished at the end of a case, procedural due process as well as basic considerations of fairness require an opportunity for all parties to examine the new data, to cross-examine the utility's witnesses regarding it and to offer such evidence in surrebuttal as necessary.

In view of the testimony of the Company's own officers, it is surprising it would claim subsequently on petition to the Commission for reconsideration and on appeal here that the use of June 30, 1975 as a test year was an issue in the case.

---

5. Our dissenting colleagues brush aside the foregoing testimony of the Company's Vice President for Finance and its President by suggesting that one of the principal ways the majority justifies its disposition of the case is "by utilizing out of context a few selected phrases uttered during the hearing by Pepco representatives—as to whether the test year should have ended on December 31, 1974, or June 30, 1975."

In the accompanying footnote the dissent, which was authored by the minority here, states, "To complete the picture of what was said on the subject, see *Pepco I,* 380 A.2d at 140, 141 . . . and 166, 167." We note, however, that the picture there portrayed omitted the foregoing testimony of President Thompson.

While the Commission did use average 1974 figures for CWIP and M&S, as well as 1974

data for PJM Interchange sales, the Commission for the most part used an "end-of-period" rate base for 1974 to account for attrition (*see* subheading "Attrition" *infra*). The record shows that in making these determinations, the Commission did not ignore the available figures for the first six months of 1975. There is substantial evidence of record supporting the Commission's position on each of these rate base components and, taken together, the Commission's findings lead rationally to its order. This case, therefore, is unlike *Washington Public Interest Organization v. PSC,* D.C.App., 393 A.2d 71 (1978), in which the Commission had not yet satisfied the substantial evidence test because it had not satisfactorily explained the rational connection between the Uniform System of Accounts (specifically, allocation of capital gains on land to the shareholders) and the rate making result.

■ Although the Company is expected to base its application on a specified test year, when a dispute arises later as did here, it is up to the Commission in the reasonable exercise of its discretion to determine to what extent the new data can and should be used. In this case the Commission and intervenors had good reason to conclude from the express words of Company witnesses and the apparent acquiescence of Company counsel in the position they articulated, that the Company was not insisting that a new test year be established. Counsel asserted no new position and made no motions for the adoption of a new test year. Later in oral argument to the Commission Pepco did not raise any question about a June 30, 1975 test year. Instead its lawyers appeared to assume that a 1974 test year was to be used. Company counsel, Carl D. Hobelman, said, for example:

> Now what solutions to the attrition problem exist?

> The one that's traditionally been used by this Commission and most others is year-end rate base, and we think that if this Commission is going to stick with the 1974 test period that that's a minimum.

■ Edward A. Caine, the other Pepco counsel who argued, flatly stated, while discussing the possible effect of Company land transactions, "[t]he test period in this case is 1974." The case having been filed and tried on a 1974 test year up to almost the last day, the Commission had ample basis to support the exercise of its discretion to use a 1974 test year, utilizing the 1975 updated figures as it deemed appropriate.

The Supreme Court of Arkansas has had occasion to address a strikingly similar situation. In *Arkansas Power & Light Co. v. Arkansas Public Service Commission*, 226 Ark. 225, 233–234, 289 S.W.2d 668, 673 (1956), where the Commission refused to consider information submitted as to post-test year data, the court held:

As to the testing period, it clearly appears to us from the record that the appellant, itself, in its rate application chose the testing period, and the Commission accepted appellant's choice. Appellant's application was tried throughout on the theory that the test period should be the 12 months ending March 31, 1954. In other words, March 31 was to be the cut-off period of this pattern year.

We find this reasoning to be persuasive and hold there was no error in the Commission's decision not to make a last minute change in the test year. *See also New England Power Co. v. Federal Power Commission*, No. 75–1379 (unpublished) (1st Cir., Nov. 13, 1975).

We would also observe, however, that the Company's request that we reverse the Commission's decision on this issue and remand for a revision of rates upward based on 1975 data is complicated somewhat by the fact that after the Commission released its order in the instant case, Pepco promptly filed a new application with the PSC on December 29, 1975, seeking a further rate increase based on a 1975 test year. That application resulted in Order No. 5849 of December 16, 1976, granting Pepco an increase in revenues of $29.4 million based on the 1975 data. That order has superseded the order under review here (Order No. 5739) and the Company is presently operating under the December 1976 order.[6]

The increase provided therein was awarded on the basis of the Company's operating experience for the calendar year 1975 and its financial condition as reflected by its books as of December 31, 1975. A remand now for the granting of a substantial increase to the Company's net earnings based on the first six months of 1975, as ordered by the division,[7] would cause a material change in the Company's balance sheet as of December 31, 1975. That is to say that

---

6. We note that while the December 1975 application was pending, the PSC denied an interim rate increase to the Company and the Company's petition to this court for review (appeal No. 10909) was dismissed by this court on March 10, 1979.

7. *See Potomac Elec. Power Co. v. Public Serv. Comm'n, supra,* 380 A.2d at 147. The increase would be realized by a surcharge on present customers. *Id.* at 148.

the financial data would no longer be valid that were used to support the 1976 rate increase. The figure for 1975 net earnings might have been as much as $20 million less than the corrected figure. Should such a windfall go to the shareholders or be rebated to the 1976 ratepayers who paid an increased rate that turned out to provide the Company with greater revenues than were intended by the 1976 order? Surely the PSC would not have granted the full $29 million increase in December 1976 had it known this court was later to award the Company a substantial increase in 1975 earnings possibly up to $20 million.

A reversal and remand of the December 1975 order to the PSC at this juncture would confront the Commission and the parties with the problem of how to increase that rate in light of data for the first half of 1975 when the Commission has already put into effect a new rate based on figures for the full 1975 test year. Such a reconsideration on remand of a revised test period that overlaps a subsequent rate order cannot be compared to the Commission using the last part of the previous test period in making a new rate that will operate prospectively. For example, the PSC might want to consider a rate increase after only six months had passed since the last order but desire to base its determination on the full previous year. In that case the PSC of course would take into consideration the previous treatment of the overlapping period and no change would have occurred in those figures. The PSC would have the full picture before it in the subsequent proceeding. Here, however, the latter order which set rates in 1976 has already been finalized and there is no opportunity to take into consideration the revised financial data for 1975. Using overlapping periods for prospective ratemaking poses no problem. But in this case the division would have the PSC enlarge an old test period thereby changing the financial picture for the Company affecting a test period upon which an intervening rate increase has long since been finalized.

In respect to the effect on a remand by the intervening filing of a new application for another rate increase, the circuit has said:

> These matters having been disposed of by this opinion insofar as it is possible now to do so, very little will be left which could be remanded to the Commission, especially as any possible remaining issues are also restricted by a new application of the Company to the Commission for a rate increase, filed since argument of these appeals, and of which we take judicial notice. *Remand to the Commission, in the circumstances of this case, could not be to enable a rate order to be superimposed upon the old application,* filed July 14, 1949. [*Washington Gas Light Co. v. Baker,* 90 U.S.App.D.C. 98, 104, 195 F.2d 29, 35 (1951) (emphasis added).]

In *Baker* the company had filed an overlapping application whereas here the PSC has already issued an order on a subsequent application.

We are not saying that the 1976 rate order based on a calendar-1975 test year necessarily precludes equitable relief with respect to the previous rate order based on a somewhat earlier, though overlapping, test year (*i. e.,* one extending several months into 1975). We are saying, rather, that the second rate order inevitably updated, and thus to some extent corrected, the Company's rate structure, thereby reducing any claim to equitable relief. The Company's position on appeal does not take account of this 1976 adjustment; however, in view of our disposition affirming the Commission's order, we need not further consider how the second rate order might bear on the one at issue.

■ The question, however, of mootness is not so clear. Pepco seeks an opportunity to be made whole for the revenues it claims it lost during the period this order was effective, from December 13, 1975, to the effective date of the order of December 16, 1976, by reason of the asserted arbitrary decision of the Commission. Pepco, as well as the majority opinion of the division, suggested that this could be accomplished, if

need be, by imposing a surcharge on present customers. Fortunately, as already indicated, we need not reach the complicated problem of equitable relief in light of our disposition of the case. In any event, the Company's sole remedy to seek relief was by appealing the questioned order, which issue we now have before us. Since we view that part of the case as being a contested issue, we deny the motion of the PSC to dismiss this proceeding as moot.

## ATTRITION

"Attrition 'describe[s] the tendency of the rate of return to diminish in a period of comparatively high construction costs . . . As the high cost plant comes into service, it tends to increase the applicable rate base [investment] at a *more rapid pace* than the resultant earnings [net operating revenues], and the rate of return decreases accordingly.'" *Telephone Users Association v. Public Service Commission, supra* at 298, *quoting New England Telephone & Telegraph Co. v. Department of Public Utilities,* 331 Mass. 604, 121 N.E.2d 896, 906 (1954).[8]

The Company contends that the Commission's failure to adjust the test year figures for continuing attrition was arbitrary, capricious and unreasonable as a matter of law. Contrary to the Company's contention, it is patently clear that the Commission did not fail to account for attrition. The final order of the Commission is replete with comments that demonstrate its concern for the problem and the consideration it gave to the evidence of attrition. We note that the Commission found in its order at pages 24 and 25:

In short, we are persuaded that attrition is a phenomenon that is still with us, and we will therefore now, as we have in the past, use an end of period rate base, with appropriate adjustments, in order to compensate for the presence of attrition.

■ In determining a fair return for the Company in terms of dollars per annum, a regulatory commission determines what a fair rate of return would be and then applies that percentage rate to a so-called rate base. Ordinarily the average rate base of the utility for the test period is used. *Telephone Users Association v. Public Service Commission, supra* at 298. However, in order to combat the effects of attrition, we have recognized an exception to the general rule so that when attrition is found to exist the commission may use a company's year-end rather than year's average rate base. *Id.; City of Lynchburg v. Chesapeake & Potomac Telephone Co.,* 200 Va. 706, 107 S.E.2d 462, 469 (Va.1959). This is what occurred in the instant case with certain limited exceptions. The PSC found that attrition existed and accordingly chose to follow this court's suggestion in the *Telephone Users* case and, by and large, used an end-of-year rate base.

## RATE BASE

The value attributed to the Company's plant in service constitutes the largest component of a utility's rate base. The next largest component is the construction work in progress (CWIP) which includes the cost of expansion projects prior to their completion at which time their value is transferred to the plant in service account. Also of importance is the Company's investment in materials and supplies (M&S).

■ Specifically, the Company alleges that the Commission erred in (1) including only Pepco's 1974 *average* investment in construction work in progress in the rate base; (2) including only Pepco's 1974 *average* investment in materials and supplies; and (3) including too large an amount of net Pennsylvania, New Jersey and Maryland Interchange (PJM) sales (*see infra*) as an element of operating income. However, in exercising its ratemaking responsibility, the Commission is not bound to use any particular methodology, nor is it bound to adopt any particular alternative proposed. *Goodman v. Public Service Commission,* 162

---

8. For additional definitions of attrition *see Telephone Users Ass'n v. Public Service Comm'n, supra* at 298 n. 11.

U.S.App.D.C. 74, 82, 497 F.2d 661, 669 (1974).

In *Goodman* the circuit held that:

In its ultimate determination of future revenue requirements, the Commission had a choice of two figures: 1) the average values applying throughout the test-year ("weighted" rate base); or 2) the values on the last day of the test-year ("end-of-period" rate base). [*Id.* at 82, 497 F.2d at 669.]

Assets committed to construction work in progress by their nature provide no service to the public or income to the Company. They are included in the rate base in this jurisdiction to provide a return to the investor for that part of his funds which are currently tied up in nonproductive plants. As those plants are completed and move out of CWIP into plant in service, they become revenue producing.[9]

The Commission's staff witness testified that the flow of dollars into CWIP increased very substantially from $187,000,000 on January 1, 1974, to $359,000,000 at year's end.[10]

People's Counsel, citing examples where only 60% of CWIP was used in some jurisdictions, recommended that the Commission adopt the rule followed in others that allow CWIP only up to 10% of the useful plant value. (People's Counsel Exhibit C, at 38.) The League of Women Voters asked the Commission to return to its former policy, still followed by many regulatory bodies, of excluding CWIP altogether from the rate base (brief at 6).

In view of the unusually high year-end figures, the General Services Administration urged the Commission to use a weighted average figure for CWIP, as did the Commission staff. It argued that the high year-end figure should be adjusted to normalize it to reflect conditions that may reasonably be expected to be experienced during the period the rates will be in effect.

After noting there were wide fluctuations in both the amounts of CWIP and M&S, the PSC found that: "The amounts at the end of the period in both accounts appear to be abnormally high. In view of Pepco's projected reduction in its construction program and the reduction in fuel inventory in 1975, we do not believe that the end period figures can be called representative of anticipated future conditions." (Public Service Commission Order No. 5739 at 26.)[11] Projections of future CWIP for the period 1975 through 1977 indicated year-end averages for those years of only $288,000,000, which is quite close to the $284,000,000 1974 average figure recommended by the Commission staff. Consequently, if a year-end CWIP figure were used (which was not likely to be representative of future CWIP levels) a skewed rate base would result.[12] The Commission found

---

9. As did Chalk Point III in May 1975, although figures were not available as to its revenue productivity.

10. Since Pepco operates in Maryland and Virginia as well as the District of Columbia, only those percentages of Company figures properly allocated to the District of Columbia operation are used in computing the rate base for the District. For example, the figure for District of Columbia plant in service is computed by taking 44.82% of the total plant in service. Consequently, the Company originally arrived at a figure of $657,634,000 or 44.82% of the total plant of $1,467,207,000.

Likewise, in computing CWIP only that part of the total figure attributable to the District of Columbia operation is used. Of the total of $377,508,000 claimed originally by the Company, it allotted only $155,863,000 in its computation of the District of Columbia rate base or 41.29%. Pepco Exhibits 9, W 29 and W 30.

The staff used the same percentage figure for plant in service but allocated only 36.69% of total CWIP to the District of Columbia. *See* Staff Exhibit 4 SM–2, Sch. A p.1. On the other hand, the staff allocated 53.64% to the District of Columbia operation for plant held for future use. *Id.* The lower figure for CWIP may result from the fact that Chalk Point III, then under construction, is located in Aquasco, Maryland. Pepco Exhibit 8, at 2–3.

11. The figures for a test year are not binding on the Commission except to the extent it concludes they may be considered representative of the future.

12. Given a certain desired rate of return, the larger the rate base of the utility the greater will be its revenue requirement. *Telephone Users Ass'n v. Public Service Comm'n, supra* at 298.

that this could not be justified and thus decided that it would use an average rather than year-end CWIP figure. We find this conclusion to be supported by substantial evidence and accordingly the PSC's judgment on the matter will not be disturbed. *Telephone Users Association v. Public Service Commission, supra.*

In a similar vein, Pepco challenges the inclusion of only an average rather than an end of the 1974 year figure in the rate base for investment in materials and supplies. The Commission decided to use an average figure for 1974 ($66,296,000) rather than the larger year-end amount ($88,073,000). We conclude that the evidence produced before the PSC supported this result.

The Commission heard testimony that the year-end figure was a consequence of an historic but passing instability in the fuel market. Pepco, like other companies, had increased its fuel inventories substantially during 1974 because of abnormal conditions suggesting a forthcoming fuel shortage. The scarcity that developed caused fuel supplies to be stockpiled to assure adequate supplies during the energy crisis. The staff review of the Company's previous three years indicated large month-to-month fluctuations in inventory balances. In addition there was testimony that the average levels in those years were more representative of normal conditions. The use of the weighted year average recognized a return to stability in the market. As the New Jersey Supreme Court stated in *Atlantic City Sewerage Co. v. Board of Public Utilities Commission,* 128 N.J.L. 359, 367, 26 A.2d 71, 76 (Sup.Ct.1942), *aff'd,* 129 N.J.L. 401, 29 A.2d 850 (N.J.Ct.Err. & App.1942):

> Abnormally high prices for . . . material attendant upon an unstable market do not afford a just criterion of the value of property for rate purposes.

■ We find that as with CWIP, there was substantial evidence justifying the Commission's finding that year-end amounts in the materials and supplies account were unusually high and that an average computation would be more reflective of future conditions. Accordingly, we affirm the Commission on this issue.

■ Pepco's final claim of error is that the Commission's failure to adjust its 1974 test period to reflect a change in the Company's receipts from Interchange sales to other utilities was arbitrary, capricious and unreasonable as a matter of law. It accordingly urges that the PSC's decision be reversed and remanded for further action.

This issue involves the PJM (Pennsylvania, New Jersey, Maryland) Interchange, an energy pool of approximately twelve power companies established to enhance overall reliability of service and economy of generation within the Interchange area. Member companies of this pool make sales of energy to each other from currently available excess capacity. The price of such transactions is midway between the incremental cost (essentially fuel cost) to the seller and the incremental cost to the buyer, had it generated the electricity purchased. The seller's cost is always lower or no sale is made. Thus the seller realizes a profit as measured by the difference between its incremental cost and the mid-point, and the purchaser receives electricity at a price cheaper than that at which it could have generated the electricity at the time. Over the course of a year, Pepco both sells and purchases electricity on the Interchange. However, historically it has been a net seller, and was in fact a net seller during 1974. The PSC observed in its order that there had been "a substantial decrease in the energy and capacity sold by Pepco to" the PJM Pool. Later in the order it found that "sales to PJM appear to have leveled off to a large degree."

Pepco's Interchange activities have an impact on its investors and customers. In periods between rate cases, investors bear the risk of profit and loss from such transactions. However, for ratemaking purposes, the profits realized during the test year are set off against operating expenses incurred in providing service to its customers locally. Thus recorded operating expenses for ratemaking purposes are reduced by the amount of the offset of Interchange profits to the benefit of the customers.

By their nature, Interchange activities are volatile and unpredictable. The Company admits that it has little control over the ultimate dollar value of the Interchange credits and equally little ability to predict with any degree of certainty the dollar value of such credits except over very short periods of time. However, it appears from the record that with the increasing consumer awareness of conservation of electrical power, PJM sales were declining and there was evidence to show they will continue to decline, but at a rate which cannot be precisely determined. With this basic unpredictability, it is, of course, quite difficult for the Commission to establish a figure which will accurately reflect the PJM Interchange sales for the future. However, to approximate the future sales, the Commission decided to use the test year data. Thus it used the 1974 data for calculating the net sales for PJM transactions and arrived at a figure of $46,532,000 as the amount allocable to its operations in the District of Columbia.

Pepco asserts, however, that while the PSC was considering its decision, the amount of Interchange sales continued to decline—to $32,605,000 for the 12 months ending June 30, 1975 and to $28,133,000 for the 12 months ending August 31, 1975. The Company argues that the failure of the Commission to take these figures into account was arbitrary and capricious.

We cannot say that the Commission's decision to be guided by figures for the 1974 test year constitutes reversible error. This portion of the Commission's order, like any other, must be read in context. It appears the Commission was well aware of the point made by the Company and did not ignore it. In its Final Opinion and Order the Commission said:

The latter part of 1974, however, witnessed a sharp and steady decline in the PEPCO financial results. Viewing the record as a whole, two factors stand out as perhaps the principal causes of this decline: (1) energy conservation resulted in a substantial decrease in the number of kilowatt hours sold at retail by PEPCO in 1974; and (2) a substantial decrease in the energy and capacity sold by PEPCO to the Pennsylvania, New Jersey, Maryand (PJM) Pool, of which PEPCO is a member. Had these two dramatic changes not occurred, the need for a rate increase application by PEPCO may very well have been eliminated. Together, the two changes represented an order of magnitude decrease in PEPCO's gross revenue of some $65,000,000.

We see no evidence of record which persuades us that there will be a return to past normalcy in the near future in either or both of these items. Although 1975 operating data, of which we may take official notice, indicates a resumption of a growth trend in retail kilowatt hour sales, it appears that the over 60% reduction in PJM sales is continuing and thus the two factors tend to offset each other to some degree. Thus, while 1974 was indeed an unusual year for PEPCO when compared to the 1970–1973 period, the record indicates that 1974 level conditions, rather than those prevailing in 1973, are more representative of conditions reasonably expected to exist in the future.

A look at the future, therefore, indicates a new and different "normalcy" on which our predictions of things to come may properly be based. With that base, we believe that adherence to traditional regulatory concepts will give reasonable assurance of achieving the desired end result. We shall therefore follow that course here . . . . [*Id.* at 6–7.]

Later the Commission observed:

We are not persuaded, however, that the decline in earnings has been due solely to attrition, but has in large part been due to the drop in sales noted previously. Since sales to retail customers appear to have resumed a somewhat normal growth pattern, and since sales to PJM appear to have leveled off to a large degree, and since PEPCO has substantially reduced its construction budget, it appears reasonable to conclude that attrition in the future may play a less significant role than it has in the past. [*Id.* at 25.]

We are mindful of the volatile nature of Interchange sales and their unpredictability and the fact that the Commission has already given consideration to that problem. The Commission's reasoning is not without logic and gives no indication of being arbitrary. Further, there is evidence in the record to support its findings and conclusions in this regard. Accordingly we hold the Commission's action was not arbitrary, capricious and unreasonable as a matter of law and we will not substitute our judgment for that of the Commission.

There being no other issues raised and "the findings of fact by the Commission [being] conclusive unless it shall appear that such findings of the Commission are unreasonable, arbitrary or capricious" (D.C.Code 1973, § 43–706) and finding no reversible error of law, the appeal is dismissed and the decision of the Commission is

*Affirmed.*[13]

HARRIS, Associate Judge, with whom NEBEKER, Associate Judge, concurs, dissenting:

This is the first major public utility rate case to be handled by this court (as a consequence of the Court Reform and Criminal Procedure Act of 1970, see D.C.Code 1973, § 43–705). Because of that fact, in writing the original majority opinion for the division, particular care was taken to describe the applicable legal principles and to spell out in detail the errors in the Commission's disposition of the case. *Potomac Electric Power Co. v. PSC*, D.C.App., 380 A.2d 126 (1977) (hereinafter cited as *Pepco I*). With all due respect for my esteemed colleague, Judge YEAGLEY's then-dissenting opinion did not reflect a recognition of certain basic characteristics of ratemaking proceedings. *See Pepco I*, at 150–62. The deficiencies in Judge YEAGLEY's dissent were cogently addressed by Judge NEBEKER in his concurring opinion. *See Pepco I*, at 164–69.

It would be difficult for me to conceive of a rate case in which the agency's action could more readily be seen to be erroneous than this case. *See* D.C.Code 1973, § 43–706. One result of the majority's resolution of this appeal seems regrettably inescapable: The Commission will conclude that virtually any treatment of a utility which purports to be "pro-consumer" in nature is likely to escape perceptive judicial review.[1]

The temptation is strong to challenge item-by-item the many flaws in the majority opinion. Such an exercise is not necessary, however, since there are three existing well-documented opinions which address the issues at length. The first is the opinion of Commissioner Stratton written in dissent to the Commission's decision. *In re Potomac Electric Power Co.*, 11 P.U.R.4th 215, 237–51 (PSC D.C.1975). The second and third, as noted above, are the majority and concurring opinions in *Pepco I* which the majority has chosen to overturn. I would, however, now make a few comments, supplemented by a number of references to portions of Commissioner Stratton's dissent which were not referred to in my earlier opinion for the division majority.

The Commission decided upon an overall 9.1 percent rate of return for Pepco. That

---

13. The unfortunate tone of the dissent speaks for itself and dispels any need for rebuttal comment on the issues.

1. The majority's "hear no evil, see no evil" approach to this case is wholly inconsistent with the 2–1 decision of another division of this court in *Washington Public Interest Organization v. PSC*, D.C.App., 393 A.2d 71 (1978). There the majority reached the following conclusion:

> Given the presumptive validity of the Commission's expert judgment in balancing investor and consumer interests, taken against petitioners' own incomplete analysis, we must conclude that petitioners have not

made the "convincing showing" required to overturn a rate order. They cannot prevail at this time. [*Id.*, at 89.]

That, of course, should have been the end of the matter; the Commission's action should have been affirmed and the appeal dismissed. *See* D.C.Code 1973, § 43–705. However, based upon a dissatisfaction with the Commission's reliance on its established Uniform System of Accounts, the court remanded the case for further exposition by the Commission. (Judge NEBEKER and I voted to grant the petitions for rehearing en banc which were filed in that case.)

conclusion prompted the following statement by Commissioner Stratton:

> It cannot be demonstrated that the rate of return found reasonable by the commission fails the statutory test [of establishing "just and reasonable" rates], and I support it even though it is in the low range . . .. [11 P.U.R.4th at 251.]

Establishing a rate of return, however, is but a starting step in determining a utility's revenue needs. Commissioner Stratton aptly inquired: "Thus did the right hand give but what of the left hand?" *Id.*, at 240. What the left hand did, to complete the metaphor, was take away. To reduce the case to its essence, the Commission impermissibly (1) tore tens of millions of dollars out of Pepco's rate base, and (2) overstated revenue expectations from projected sales of excess generating capacity by Pepco to the PJM interchange.[2] The obvious explanation for such action, as expressed by Commissioner Stratton (with particular reference to the grossly unwarranted reduction of the rate base item of construction work in progress), is that it constituted "an expediency perpetrated in the interest of holding down rates [which] must be seen as arbitrary and is, on that basis, probably reversible error." *Id.*, at 244.

I quote Commissioner Stratton's evaluation of what basically was at stake before the Commission:

> The real issue in this case is whether this commission can so demonstrate its understanding of this utility and the world in which it must exist as to issue a rate order under which the utility can operate for a reasonable period of time without returning to us in quest of higher rates. This we have failed to do. Our failure is rooted in our denial of known and inexorable upward pressures on operating and capital costs, with which revenues must keep pace if a utility is to fulfill its service obligation. [11 P.U.R.4th at 238.]

The en banc court's majority opinion reflects an inadequate understanding of how rate cases routinely are tried. When a rate increase application is filed, typically a test year is adopted which includes a majority of past months with actual operating results (here, eight months) and a smaller number of months (here, four months) for which data are predicted. Then, as the hearing proceeds, actual data are substituted for the prior estimates. This is done quite simply, but the majority seems to see problems in such a routine substitution of numbers.[3] I agree with Commissioner Stratton's axiomatic comments on the use of a test year:

> [O]ne must recognize that the test-year approach to rate making is a forecasting methodology, as it must be, since rates are made for the future. The test-year approach [is] implemented as follows: a recent 12-month period (calendar 1974 in this case) is selected as the test year; financial results of that year's operations are used as the base data in the analytical process; [and] known changes are reflected as pro forma adjustments to the test-year operating results . . .. [11 P.U.R.4th at 238.]

> *    *    *    *    *    *

[T]he test-year device is imperfect, but, like democracy, it is probably better than the alternatives. This imperfection is compensated for in some measure by adjusting test-year data in order that it better mirror the future, typically by tak-

---

2. In its treatment of the PJM interchange issue, the majority recites some of the facts which reflect significant decreases in Pepco's revenues therefrom, but ultimately simply retreats into the "we will not substitute our judgment for that of the Commission" refuge. *Ante,* at 27. I readily recognize that we are not to substitute our judgment for that of the agency, but the Commission's actions here far transcend the rather broad area of mere judgmental differences.

3. Regulated utilities follow the Commission's Uniform System of Accounts, and Commission personnel regularly monitor the company's books. Thus, for example, if Pepco predicts that its fuel expense for the forthcoming month of June will be x dollars, it is exceptionally easy later to substitute the amount of money actually spent.

ing into account known changes that are not fully reflected in test-year data . .. [*Id.*, at 239.]

It must be borne in mind that the administrative process in this case was protracted, in part because of the delay occasioned by the establishment of the office of People's Counsel. Pepco's application was filed on December 20, 1974. The hearing began on June 4, 1975; it did not end until July 25, 1975. By that time, complete operating figures through June 30, 1975, had been introduced into evidence. Data for July and August of 1975 later were provided by the company, and oral argument was conducted on September 30, 1975.

Often in rate cases, a commission is required to exercise its discretion in determining which of the competing parties' projections are more valid. That was not true here; to return to Commissioner Stratton's analysis:

But the commission was not compelled to select between the conjecture of the company and the conjecture of the staff. We have accepted into the record monthly operating statements and balance sheets for the first eight months of 1975, and these were available to us as we deliberated upon this case. I had thought our purpose in accepting current financial reports was to permit us to make a better informed decision. Are we free to decline the opportunity to do so? I think not. [*Id.*, at 241.]

There is an interesting passage in the en banc court's majority opinion. The majority recognizes that:

[T]he most recent available material must be considered and weighed by the Commission in reaching decisions on ratemaking. This is consistent with effective ratemaking policy. If recent operating figures are completely ignored, the new rate will be based on old and perhaps no longer valid data. [*Ante*, at 18.]

How the majority could acknowledge those truths and still fail to see the errors in the Commission's actions defies comprehension. The original opinion for the division majority sets forth in detail the Commis-

sion's distorted treatment of the rate base items of both materials and supplies and construction work in progress (CWIP), and of the revenue item relating to PJM interchange sales. 380 A.2d at 145–47. I shall not restate those points here, but a brief description of what the Commission did with respect to one component of CWIP warrants inclusion in this dissent.

The funds expended by the utility for CWIP consistently have been included in its rate base. During all of 1974, a new generating plant—Chalk Point Unit No. 3—was under construction. There was no question as to the dollar amounts expended on that project. In May of 1975, months before the record was closed, the new plant was placed in operation, and the roughly $160 million which it cost were transferred from the company's CWIP account to the plant in service account. These facts were routine and unchallenged, and any objective observer would have deemed it inconceivable for the Commission to fail to include that $160 million in the company's overall rate base (with the appropriate percentage thereof going into Pepco's District of Columbia rate base). In what must surely have been one of the most arbitrary actions in the history of American ratemaking, however, the Commission refused to include the completed Chalk Point Unit No. 3 in the rate base. Moreover, although in the 1970 and 1973 decisions in prior Pepco rate cases the Commission properly sought to compensate for attrition by using a year-end computation of CWIP, here it further eroded the rate base by taking a 1974 average CWIP figure.

The overall effect of the several devices thus arbitrarily and unreasonably utilized by the Commission was to reduce the company's District of Columbia rate base to $650,091,000 [*see* 11 P.U.R.4th at 228], and to understate the company's revenue needs by exaggerating the net receipts supposedly anticipated from PJM sales. In the final paragraph of his dissent, Commissioner Stratton stated: "At a minimum, the rate base should have been established at $693 million . . .." *Id.*, at 251. I share that conclusion.

The majority seeks to justify its disposition of this case in two principal ways. The first is an artificial semantic exercise—performed by utilizing out of context a few selected phrases uttered during the hearing by Pepco representatives—as to whether the test year should have ended December 31, 1974, or June 30, 1975.[4] Not only is the majority's treatment of that question illogical (there is no doubt on this record but that Pepco—quite understandably in this period of severe inflation and rampant fuel cost increases—wanted to use its most current actual operating data); it also is largely irrelevant. As I have noted, the en banc majority recognizes the obligation of the Commission to use current data; as long as such figures are used it matters little whether we say that the test year should have ended June 30, 1975 (as did the original majority opinion for the division), or that the Commission was obliged to adjust the test year data to reflect known later facts of record. Considered properly, the record simply reflects Pepco's related anxieties to avoid further delays and achieve prompt rate relief.

The second way in which the majority supports its result is by (1) making cursory references to Pepco's contentions on appeal, followed by (2) stating with respect to each contention that the Commission considered the subject, hence effectively ending the matter.[5] Such an approach, however, begs the issue. It is beyond question that the Commission considered what it was doing; its rulings were calculated, not accidental. It determined that Pepco theoretically

should have the opportunity to earn an overall 9.1 percent rate of return, but then by the devices discussed above—such as erroneously reducing the company's District of Columbia rate base by some $43 million, to accept Commissioner Stratton's figure— it made it a certainty that such a rate of return could not be achieved. (An erroneous diminution of rate base correspondingly erroneously reduces revenues, for revenues are mathematically linked to rate base.)

A third factor militating towards affirmance appears in the en banc majority opinion, although the extent of its effect is difficult to ascertain. The majority devotes several pages of its opinion to expressing concern as to the complications which would be presented if we were to reverse. *Ante*, at 21–22. Such an approach is grievously unfair to Pepco as a party in this court; it is entitled to have its case determined exclusively "upon the record" on appeal (D.C.Code 1973, § 43–705), and a consideration of the potential consequences of a reversal is irrelevant to the requisite basic analysis as to whether the Commission's decision is to be affirmed or reversed—exclusively on its merits.[6]

In turning to an overview of this case, one maxim must be recognized: A regulatory commission which is unduly pro-consumer inevitably must be recognized to be anti-consumer as well. To jeopardize a utility's economic stability is simultaneously to jeopardize its ability to provide the service upon which its customers so vitally depend (as well, incidentally, as to increase its costs

---

4. The en banc court's majority opinion—like Judge YEAGLEY's earlier dissent—is unduly selective in its excerpting of the relevant remarks from the record. To complete the picture of what was said on the subject, *see Pepco I*, 380 A.2d at 140–41 (majority opinion) and 166–67 (NEBEKER, J., concurring).

5. In the *Washington Public Interest Organization* case which I cited in footnote 1, *supra*, the majority of that division recognized the risk that a "non-expert" court "could simply be fooled into accepting arbitrary agency action by the mesmerizing influence of the confidently expressed language of experts." 393 A.2d at 78. Regrettably, that concern has become a reality in this case.

6. In his prior dissent to the majority opinion of the division, Judge YEAGLEY took the position that his view of the case was demonstrably correct since the market price of Pepco's stock had risen subsequent to the Commission's decision. *Pepco I*, 380 A.2d at 159–60. Such an analysis was both faulty and unwarranted, as noted by Judge NEBEKER in his concurring opinion. *Id.*, at 168–69. I note with some relief that the notion that stock prices are indicative of whether an agency's ruling is proper or erroneous has had at least no visible effect upon the en banc majority's disposition of the case.

of obtaining capital, which costs in the long run must be borne by the ratepayers). The Commission does not have a partisan role; it has both a statutory and a constitutional obligation to set just and reasonable rates, *i. e.*, rates which permit a utility the opportunity to earn a fair rate of return on its investment. *See Pepco I, supra*, 380 A.2d at 131–32 and cases there cited. If the Commission arbitrarily refuses to achieve the requisite delicate balance between consumer and investor interests, it is not only violating the utility's constitutional rights, it is harming the true long-range interests of consumers as well. *Ibid.* That is precisely what occurred in this case.

Commissioner Stratton's dissatisfaction with his agency's disposition of this case was such that he was moved to express the following beliefs:

> To sum up, the commission's order posits an economic environment reminiscent of the early 1960's. In failing to acknowledge and deal with the fact that operating and capital requirements per unit of sales have risen, and continue to rise, faster than revenues the commission has taken a step that can only bring regulation in the District of Columbia into disrepute among the fair-minded and knowledgeable. [11 P.U.R.4th at 251.]

I feel comparable consternation at my colleagues' superficial approach to their review of the Commission's actions. In my view, the majority's failure to recognize the realities of this case is analytically indefensible. Accordingly, I respectfully dissent.