**WASHINGTON PUBLIC INTEREST ORGANIZATION et al., Petitioners,**

v.

**PUBLIC SERVICE COMMISSION of the District of Columbia, Respondent,**

**Washington Gas Light Company, Intervenor.**

**PEOPLE'S COUNSEL, Petitioner,**

v.

**PUBLIC SERVICE COMMISSION of the District of Columbia, Respondent,**

**Washington Gas Light Company, Intervenor.**

**WASHINGTON PUBLIC INTEREST ORGANIZATION et al., Petitioners,**

v.

**PUBLIC SERVICE COMMISSION of the District of Columbia, Respondent,**

**Potomac Electric Power Company, Intervenor.**

**Nos. 11780, 11786 and 12017.**

District of Columbia Court of Appeals.

July 17, 1979.

Supplemental Opinion Aug. 2, 1979.

For Majority Opinion, see 393 A.2d 71 (1978).

NEBEKER, Associate Judge, dissenting.

In my statement filed on September 12, 1978, see *Washington Public Interest Organization v. Public Service Commission*, D.C.App., 393 A.2d 71, 94 (1978), I reserved the right to dissent until after the opinion in *Potomac Electric Power v. Public Service Commission*, D.C.App., 402 A.2d 14 (1979) (en banc), was filed. I did so because of inconsistencies I perceived between the drafts of the majority in this case and the en banc case. While I joined in Judge Harris' dissent in the en banc case, it seemed clear to me that my colleagues in this case were not coordinating their position with their votes in the en banc case.

They thus were taking contrary views, a circumstance which I was not earlier free to express without divulging the yet to be published outcome and rationale in the en banc case. My request of my colleagues to delay issuance of the majority opinion in this case was not honored.

## I. Scope of Review—Inconsistency in the Majority and En Banc Opinions

The scope of review concepts applied in the majority opinion in this case sharply contrast with the scope of review expressed and applied in *Potomac Electric Power Co. v. Public Service Commission, supra.* The two opinions conflict expressly and implicitly on (1) the authority defining our scope of review, (2) the "burden" on the agency to explain the rationale for its conclusions and (3) the "burden" on this court to address issues not raised, briefed or mentioned by the parties at either the administrative or the appellate level. Although the majority has gone to a great length to establish this as a landmark case regarding our scope of review in rate matters, the en banc decision casts considerable doubt on the viability of certain of the majority opinion's fundamen-

tal premises. In fact, the en banc case does not cite the majority opinion in addressing the topic of scope of review.[1]

The majority and en banc opinions differ in explaining the authority defining our scope of review. Both agree that our scope is governed by D.C.Code 1973, § 43–706.[2] From this common ground, however, the opinions evolve in different directions. The en banc decision defines our scope of review more narrowly than the majority decision does. The en banc opinion states that a different scope of review applies for rate proceedings than for other types of administrative cases. Further, it states that "[o]ur review of a utility commission order is the narrowest judicial review in the field of administrative law." At 17. In conjunction with this view, the en banc opinion conspicuously (and correctly) omits any citation to the scope of review provisions of the District of Columbia Administrative Procedure Act (D.C.A.P.A.), D.C.Code 1973, § 1–1501 *et seq.*[3] By contrast, the majority opinion sets forth a much broader scope of review. To the majority, there is no distinction between our scope of review of utility rate orders and our scope of review

---

1. The sole reference in the en banc case to the majority opinion in this case is at 20 n.5.

2. D.C.Code 1973, § 43–706 provides:

    In the determination of any appeal from an order or decision of the Commission the review by the court shall be limited to questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings of the Commission are unreasonable, arbitrary or capricious.

3. The en banc court's determination, that the D.C.A.P.A. provisions on scope of review are inapplicable to utility rate order reviews, is supported by the provisions defining the scope of the D.C.A.P.A. Section 1–1510 states:

    The review of all administrative orders and decisions by the court shall be limited to such issues of law or fact as are subject to review on appeal under *applicable statutory law, other than this subchapter. In all other cases* the review by the court . . . shall be in accordance with [, *inter alia,*] D.C.Code 1978 Supp., §§ 1–1510(1) to –1510(3). [Emphasis added.]

    Title 43 of the D.C.Code, and in particular D.C. Code 1973, § 43–706 (quoted above), prescribes our scope of review of utility rate orders. Title

43, therefore, is the "applicable statutory law" referred to in § 1–1510. As utility rate proceedings on appeal fall within the ambit of the first quoted sentence of § 1–1510, the second sentence is inapplicable because, by its terms, it covers only cases not governed by the first sentence. The implicit decision by the en banc court, that the scope of review provisions of the D.C.A.P.A. are inapplicable to utility rate cases, is consistent with the § 1–1510 provisions which define the scope of the section's subsections.

The en banc court's determination is also consistent with *Chesapeake & Potomac Telephone Co. v. P. S. C.*, D.C.App., 339 A.2d 710, 712–14 (1975). The court there stated that "*except in the area of* appellate procedure and *scope of review*, the drafters of the APA intended the [APA] to apply to the [Public Service] Commission." *Id.* at 712–13 (emphasis added). The District of Columbia Administrative Practice manual, prepared by the drafters of the D.C.A.P.A., did not intend the D.C.A.P.A. to prescribe the "standard of review" for *P. S. C.* cases. *Id.* at 713. *See* D.C.Code 1973, § 11–722 ("review of orders and decision of the" P. S. C. not governed by D.C.A.P.A.).

of all other administrative orders. This is demonstrated by the majority's reliance on cases which only interpret the very D.C. P.A. provisions which the en banc court viewed as inapplicable[4] to utility rate orders.[5] Therefore, whereas the en banc decision holds that "[o]ur review of a utility commission order is the narrowest judicial review in the field of administrative law,"[6] the majority opinion implicitly holds that our review is no narrower in utility rate cases than in cases regarding the remainder of the field of administrative law. I believe that had the narrower scope of review later espoused by the en banc court been employed by the majority in this case, the majority could only have decided to affirm, as did the en banc court in the *Pepco* case.

The two opinions also differ on what the majority here terms as the agency's "burden . . . to explain its actions fully and clearly."[7] While a specific explanation of the agency's action, as reflected in its findings and conclusions, facilitates the appellate review process, the degree of explicitness demanded by the majority is much higher than that required by the en banc court in *Pepco*. Two examples from the en banc opinion will suffice to demonstrate the disparate treatment accorded by the two bodies. For each example, the en banc court engaged in a three step process of (1) defining the party's contention, (2) noting that the Commission was cognizant of the contention and (3) stating that the conten-

tion was rejected. For example, on the issue of attrition, the en banc opinion states: (1) the company contended that the Commission failed "to adjust the test year figures for continuing attrition . . .", (2) the Commission's final order contains "comments that demonstrate its concern for the problem and the consideration it gave to the evidence of attrition," and (3) the Commission "by and large" did what it had done in the past; the order is affirmed.[8] *Potomac Electric Power Co. v. Public Service Commission, supra,* at 23. A second example of the en banc court's light touch regards the PJM interchange sales issue. The en banc court states: (1) the company contended that the Commission should adjust the test year amount of interchange sales because the amount of rate year (1975) sales would be considerably less than were sales during the test year (1974), (2) "the Commission was well aware of the point made by the company and did not ignore it" and (3) the Commission decided not to reduce the amount; the order is affirmed. *Id.,* at 25–27.

In neither of those instances did the en banc court exact from the Commission the step-by-step explanation that the majority here contends is required by the law. As to the attrition issue, the en banc court did not require the Commission to explain why the company's contention was rejected, but only to state that the Commission had considered the request and consciously rejected it.[9] On

---

4. *See* note 3 *supra.*

5. *See Washington Public Interest Organization v. Public Service Commission, supra* at 77.

6. *See Potomac Electric Power Co. v. Public Service Commission, supra,* at 17.

7. *Washington Public Interest Organization v. Public Service Commission, supra* at 75.

I follow the majority opinion's organization by including this topic under scope of review, although I consider this to be technically improper. *Compare* D.C.Code 1973, § 43–705 *and* § 1–1510 (judicial review) *with* § 1–1509 (agency action). It is upon § 1–1509(e) that the majority relies in imposing this "burden to articulate" upon the Commission.

8. The en banc majority opinion in the *Pepco* case treated the attrition issue in a fashion

which is quite imprecise. For a proper description of the subject matter, see the vacated division majority opinion in *Pepco v. P. S. C.,* D.C.App., 380 A.2d 126, 143–45 (1977).

9. It is not enough to say that the reason was expressed in *Telephone Users Ass'n v. P. S. C.,* D.C.App., 304 A.2d 293, 298 (1973), because that decision did not address the issue. The issue there under consideration was the reasonableness of employing a weighted average rate base rather than a year-end rate base. The utility contended that the average rate base was unreasonably small in view of the anticipated attrition. In *Pepco,* the utility claimed that the *year-end* was unreasonably small and, therefore required adjustment, in view of the anticipated attrition. Thus, the issue before the Commission was not resolved by *Telephone Users.*

the interchange sales issue as well, the en banc court in *Pepco* did not require the Commission "to explain its actions fully and clearly," as the majority opinion in this case would mandate. 393 A.2d at 75. Despite the majority's position that "[a]bsent precise methodology as applied to the facts of the case, there is no way for a court to tell whether the Commission, however expert, has been arbitrary or unreasonable;"[10] the en banc court allows the Commission to withhold disclosure of its "methodology." The sole rationale advanced by the Commission for not reducing the 1974 interchange sales was that "1975 operating data, of which we may take official notice, indicates a resumption of a growth trend in [non-interchange] sales . . . and thus the two factors tend to offset each other to some degree." At 26 (quoting from the Commission's order). There was no precise finding as to what the increase in non-interchange sales would be. Neither was there a finding of what decrease was expected in interchange sales. The specific data upon which the decision was based was not disclosed, other than "1975 operating data." No reason was offered for the Commission's conclusion that the augmentation in non-interchange sales and the reduction in interchange sales would be similar in magnitude. Indeed, the Commission concedes that it never came to grips with these issues as indicated by the language of its order: "[the sales] *tend* to offset each other *to some degree.*" *Id.* (emphasis added). Clearly, had the en banc court employed the same rigorous "burden" as the majority used, the en banc court would have been constrained to remand to "[furnish] detailed findings of fact and conclusions of law,"[11] to "[show] fully and clearly why it has taken the particular ratemaking action,"[12] and to "[advance] affirmative, particularized reasons justifying its treatment" of interchange sales.[13] The en banc court's decision to affirm in *Pepco*, rather than to

remand, exemplifies the fundamental inconsistency between the two opinions.

## II. The Commission Carried Its Burden of Explanation

Even under the rigorous test established by the majority, the Commission carried its burden of demonstrating the rationale behind its decision to treat the gain on land dispositions as a below the line transaction. The majority's conclusion to remand is based on two errors. First, the majority either misperceived the issue in the case or unwarrantedly interjected a second issue. Second, the majority failed to comprehend the adequacy of the reasoning for treating the land transaction gains as below the line revenue. Had the majority exercised the same degree of diligence in seeking to understand the reason for the Commission's decision as it claimed the Commission should have exercised in explaining its rationale, it would not have remanded the record for clarification.

### A. The Issue

The majority seems confused as to the issue before it. At the outset of the majority's opinion, it explained that the rates of return were not at issue:

> While the ultimate issue, upon judicial review, is the overall effect of the rate order, this is not to say that our review must encompass all aspects of that order. In the present case, for example, the overall *rate of return* is not directly at issue. None of the petitioners question the rate levels, as such, granted WGL and Pepco; all agree (or do not contend) that for the District of Columbia operations WGL is entitled to a 9.25% overall *rate of return* each year, while Pepco is entitled annually to 9.06% overall. [393 A.2d at 79 (emphasis added).]

It then stated that the return or revenue estimation was at issue:

---

**10.** *Washington Public Interest Organization v. P. S. C., supra* at 77.

**11.** *Washington Public Interest Organization v. P. S. C., supra* at 77.

**12.** *Id.* at 75.

**13.** *Id.* at 93.

The narrow question, therefore, is whether a portion of each company's prescribed *return* should be deemed already paid by the realization of gain (or appreciation in value) on land no longer in service, entitling the customers to a short-term credit of some sort; or whether, instead, each company's *return* should be recoverable in full from charges to its customers. Thus, we are asked to limit our review to scrutiny of the Commission's expert judgment applied to but one of many elements of the ratemaking calculus. [393 A.2d at 79 (emphasis added).]

Following an eight page detour through the history and niceties of the Uniform System of Accounts, the majority abandons the issue and decides instead to resolve what is not at issue, *i. e.*, the propriety of the overall rate of return:

> The precise question is this: have petitioners made a "convincing showing" that the Commission's rate determinations are unreasonable, unjust, or discriminatory, D.C.Code 1973, § 43–301, because the decision in each case to allocate gains on particular dispositions of retired land exclusively to the investors is not rationally connected by "reliable, probative, and substantial evidence," D.C.Code 1977 Supp., § 1–1509(e), to the *rate of return* selected? Thus, we are asked to relate gains on particular land transactions to the Commission's determination of an *overall rate of return* —a complex inquiry. [393 A.2d at 85 (emphasis added and deleted) (footnote omitted).]

Having thus abandoned the issue for the "non-issue," the majority goes on to rule on the "non-issue," holding that it will remand because a relevant factor was possibly omitted from the calculation determining the overall rate of return:

> There is no indication in the record that the Commission, in determining the essential *rates of return* for WGL and Pepco, actually considered the impact of land transactions on the price of either company's common stock.

    *     *     *     *     *     *

> Accordingly we hold that when a regulatory commission calculates and approves an *overall rate of return* (and consequent rate schedule) for utility operations, based on comparative stock prices, it must factor into its determination an analysis of the impact of nonutility transactions on the price of the company's stock . . . . [*Id.* at 91–93 (emphasis added).]

Thus, while passing through the dark forest of the Uniform System of Accounts, the majority lost its bearings by about 180 degrees. For clarity, I will first address the issue and then address the "non-issue," or the issue that the majority raised *sua sponte*.

### B. The Analysis

The majority should have been content to address only the issue raised by the parties—whether the Commission reasonably excluded the gains on the land transactions from its calculations to determine "revenue." Simply stated, the issue is whether the Commission had a reasonable basis for ascribing the gains to the shareholders rather than the ratepayers. As the majority states, this court is bound by statutory and case law to affirm a Commission decision so long as it has a reasonable justification. 393 A.2d at 75. The Commission's decision was based on its accounting principles, and the majority opinion explains the justification for these principles:

> The justification for such accounting principles, with their impact on utility rates, is generally based on the proposition that the ratepayers, who have been charged for depreciation of plant facilities, should be repaid with the gains, if any, upon eventual sale of those facilities. Because land is not depreciable, however, and the ratepayers accordingly have not been responsible for replenishing it, the gains, if any, on sales of retired land are left to the investor-owners. They are the ones, at least theoretically, who brought the land to the enterprise and, as a result, should benefit. [393 A.2d at 74.]

This justification is reasonable, and thus I am compelled to vote to affirm on the issue

raised by the parties. *See* D.C.Code 1973, § 43–706. The petitioners contended that *Democratic Central Committee v. Washington Metropolitan Area Transit Comm'n*, 158 U.S.App.D.C. 107, 485 F.2d 886 (1973), *cert. denied*, 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974), mandates a different result. I agree with the majority that "*Democratic Central Committee* litigation is distinguishable as more egregious on the facts," that this "contention misses the mark" and that, therefore, "the petitioners have not made the 'convincing showing' required to overturn a rate order." 393 A.2d at 88–89.

I turn now to the "non-issue." Not contenting itself to addressing the issue raised by the petitioners concerning the calculation of revenue, the majority decided to attack the "non-issue" concerning the calculation of the overall rate of return. In particular, the majority is concerned over whether the Commission considered "the impact of nonutility transactions on the price of the company's stock" [14] in calculating the overall rate of return. This issue should not have been raised, and once raised, it should have been differently resolved, both procedurally and substantively.

There is no doubt that in certain situations, this court should raise an issue *sua sponte*.[15] In other circumstances, this court *may* properly raise an issue of its own accord. The issue raised by the majority, however, fits neither bill. Furthermore, the procedure by which the issue was raised and decided was improper. The issues addressed in a rate matter are formulated early in the long and arduous process. The parties to the administrative proceeding question witnesses and present briefs addressing specified disputed areas. The Commission presents a proposed order to the parties for comments. By the comments, the Commission is informed of any issues that it has not addressed and of any issues it may have improperly resolved. In its final order, the Commission addresses the concerns raised by the comments. To

further refine the issues and to allow the Commission an opportunity to prepare a clear explanation of its actions regarding points to be considered by this court, Congress required that a motion for reconsideration be filed as a prerequisite to raising an issue for judicial review. D.C.Code 1973, § 43–704 states:

> Any public utility or any other person or corporation affected by any final order or decision of the commission may . . . file with the commission an application in writing requesting a reconsideration of the matters involved, and *stating specifically the errors* claimed as grounds for such reconsideration. *No public utility or other person or corporation shall in any court urge or rely on any ground not so set forth in said application.* [Emphasis added.]

The briefs, record and argument before this court, then, address only the issues which endured each step of this refinement and development process. Unfortunately, the majority raises an issue that was never addressed by any of the parties either here or in the administrative proceedings. No one ever questioned the role of nonutility transactions in formulating the overall rate of return. The stipulated records on appeal do not contain the administrative hearing testimony upon which the Commission relied in setting the relevant rates of return. In lieu of informing the parties that it was concerned as to an unraised issue and requesting supplemental briefs on the subject, accompanied by the relevant portions of the record, the majority chose to proceed blindly, holding that the impact of nonutility transactions must be factored into a determination of an overall rate of return. In its conclusion, it faulted the Commission for having developed an inadequate record and for not having explained its actions on the subject. I believe that the delay and the consequent prejudice spawned by the majority's actions can only result in injustice unaccompanied by any offsetting benefit. The Commission employed the identical

---

**14.** 393 A.2d at 93.

**15.** For example, see note 22, *infra*.

method of calculating the overall rate of return here as it did in the en banc case, which was recently affirmed. The issue was not *sua sponte* raised there; it should not have been here.

Aside from the propriety and method of raising the "non-issue," I believe that it was erroneously resolved. The error primarily results from the majority's misunderstanding of the process used to determine the overall rate of return. The overall rate of return is the result of a weighted averaging of the rates of return of the different forms of investment. *See* 393 A.2d at 90. Contrary to the majority's understanding, the "discounted cash flow (DCF) analysis" is not used to compute the overall rate of return, but only the return on common stock. The DCF is a simple analysis based on the recognition that investors receive a return on their investment through dividends ("yield") and eventually through selling the stock at a profit (appreciation or "growth").[16] The rates of return received through each means are added together to obtain the total return on common equity investment. Thus, if the price of a share of common stock rises from $100 to $104 over the course of a year (4% return) and if during the year the shareholder receives an $8 dividend (8% return), his total return would be 12%. The Commission explains this at page 30 of its order respecting WGL. The majority demonstrates its misunder-

standing of this means of computing the total return on common equity by stating that the dividend yield is added to "an expected growth in *dividend*," 393 A.2d at 90, rather than referring to a growth in the value of the stock.

The most important misunderstanding, however, which provides the foundation for the majority's erroneous holding, is the mistaken belief that the Commission sets the rate of return on common equity at the figure "required to maintain each company's common stock price at or slightly above book value." 393 A.2d at 90. While this maintenance is a commendable long-term goal of any utility, it was not the short-term criterion used by the Commission here.[17] The Commission does "not endeavor to fix an equity price, which will produce a particular market-to-book ratio."[18] In the Pepco order, for example, the Commission expressly "[recognized] that it is not our function, as a regulatory body, to determine the market price of Pepco's stock . . ." In the *WGL* case, the Commission noted that the market-to-book ratio was about 0.55. If the Commission had acted in the manner in which the majority now states that it acted, the Commission would have set a *growth* rate of nearly 100% (in order to bring the ratio to 1.0 or slightly higher), whereas the Commission fixed a *total* rate of only 13.4%.[19] Therefore, while not pat-

---

**16.** A minor financing cost adjustment to this formula has been omitted from the discussion for simplicity.

**17.** A significant long-term deviation of market price from book value, whether the deviation be positive or negative, should raise a red flag for the ratemaking parties, including the Commission. The cause of the deviation should be ascertained and the responsible party should correct the situation, if any correction is needed. Many factors, other than the Commission's actions, influence the market-to-book ratio. *See, e. g., Re Chesapeake & Potomac Tel. Co.*, 4 P.U.R.4th 1, 33–34 (D.C.Pub.Ser.Comm'n 1974). *See also* note 18, *infra*.

**18.** *Re Chesapeake & Potomac Tel. Co.*, 15 P.U. R.4th 302, 319 (D.C.Pub.Ser.Comm'n 1976), *citing Re Chesapeake & Potomac Tel. Co.*, 4 P.U. R.4th 33, 34 (D.C.Pub.Ser.Comm'n 1974). In the latter case, the Commission explained that market-to-book "ratios are a product of factors

beyond the control of any regulatory commission. As a general matter, they are heavily influenced by the state of the capital market [and] by the returns fixed by other commissions" that regulate the same utility. 4 P.U. R.4th at 33–34.

**19.** The Commission did, however, make a general reference to the market-to-book ratio in a small matter regarding the People's Counsel proposal to employ principally WGL data, rather than data on comparable companies, to establish the rate of return on common equity. The Commission rejected the proposal on two grounds. First, the risks facing gas distribution companies were regarded as stemming largely from the nature of the locale served. Under this criterion, the Commission stated, "The Company inevitably fared well." The main concern of investors had increasingly shifted, however, to gas supply considerations. Because in this regard WGL is on equal footing

ently erroneous, the basis of the majority's opinion is seen to be clearly erroneous when compared to the record. I turn now to the DCF method actually used by the Commission to fix the rate of return on common equity.

In both of the Commission's orders, it accepted the opinion of the staff expert witness regarding the rate to be accorded common stock. For example, in WGL, Mr. Glassman's analysis was accepted. He analyzed the past growth and yield statistics of 18 utilities that were comparable to WGL for DCF purposes. With minor adjustments, he summed the growth and yield components of his analysis, arriving at a recommendation of a 13.4% overall rate of return on common equity. This figure was then employed in a weighted averaging of the other forms of investment to produce the overall rate of return, which was applied to the rate base. So far as the orders reveal, the identical process was employed in the Pepco proceeding, of course employing companies comparable to Pepco. Therefore, contrary to the majority's position, whatever may be the future price of WGL's and Pepco's common stock had no place in the DCF analysis employed by the experts and adopted by the Commission. The "Commission's DCF analysis [does not] show [a] minimum essential price of common stock," as the majority suggests, but shows the rate of return received in the past by common shareholders of the subject utility and of the utilities similarly situated. The majority erroneously believes that the

with other utilities which are located away from the production fields, a comparison of other comparatively situated utilities would be more meaningful than looking only to WGL's past. Second, the rates allowed in the past have resulted in the market price remaining significantly below book value for a long time, which generally does not happen if the requisite fair return is allowed. Therefore, what WGL has received in the past is not as reliable a guide as can be achieved by employing rate of return figures from comparable utilities. It was clearly not to the ratio, as the second of these two grounds, that the majority opinion repeatedly refers, because the majority does not question the correctness of the Commission's decision to reject the People's Counsel proposal.

rate of return is "based on comparative stock prices," [20] whereas it is actually based on comparative rates of return. Therefore the majority's primary concern, that the Commission may not have calculated "the impact of nonutility transactions on the price of the company's stock," fades into irrelevance and insignificance. It is unfortunate but telling that this irrelevant concern provides the sole basis for the majority's holding.

Numerous other deficiencies and inconsistencies in the majority's opinion could be addressed in order to demonstrate its fundamental misconception of the situation. The majority assumes that Pepco, for example, is comprised of only two portions: utility and nonutility. On this assumption it expresses its concern that "nonutility transactions might . . . [cause] a lower [or higher] overall rate of return than the Commission had thought essential [in order] to" "maintain the price of common stock at the appropriate level." 393 A.2d at 91. What the majority failed to recognize is that Pepco is regulated not only by "the Commission," but by Virginia, Maryland and federal commissions. It would be illogical to require the Commission to analyze "the impact of non-utility transactions" without also requiring an analysis of the impact of these other components of Pepco.[21] The majority, however, does not require an analysis excluding these components.

20. 393 A.2d at 93.

21. The difficulty attending the majority's position can perhaps best be seen in an attempt to set a rate for C & P Telephone Co., which is wholly owned by AT&T. The cost of C & P's capital is so intertwined with that of AT&T's capital that the Commission has never made a separate calculation of C & P's cost. E. g., Re Chesapeake & Potomac Tel. Co., supra at 308. Under the majority's holding, the Commission would be compelled to "factor into its [rate] determination an analysis of the impact of [non-C & P utility] transactions on the price of the company's stock . . . ." 393 A.2d at 93.

In conclusion, if the Commission ever forsakes its current method of establishing a fair rate of return on common equity in favor of the method the majority erroneously believed the Commission employed, then the majority's holding might become applicable. By its terms, however, the majority's holding is applicable only when a commission's calculation is "based on comparative stock prices." 393 A.2d at 93. I would think that a simple supplement to the record—noting that "comparative stock prices" were not employed, that the rate fixed by the Commission was not that rate which "would be required to maintain each company's stock price at or slightly above book value," and that the amorphousness and unmanageability of attempting to calculate the impact of Virginia, Maryland, federal and nonutility transactions on the prospective price of each company's stock would undermine the reliability of any attempted calculation—would suffice to elicit an affirmance on the issue raised *sua sponte* by the majority.[22] The Court is unanimous in rejecting the petitioners' contention based on *Democratic Central Committee* and *Brandywine*.[23] 393 A.2d at 87 n.17, 89. I maintain that the *sua sponte* issue should not have been raised and further, that the scope of review employed by the majority has been eroded by the subsequent en banc *Pepco* opinion. Accordingly, I dissent.

FERREN, Associate Judge, with whom NEWMAN, Chief Judge, joins:

Judge Nebeker's dissent filed July 17, 1979, suggests a need for the following brief response.

1. As to scope of review, the majority opinion specifically acknowledges that review of Commission orders is governed by the criteria set forth in the organic act creating the Commission. D.C.Code 1973, §§ 11–722, 43–705, –706. 393 A.2d at 75, 77 n.5. This court has stated, however, that the Commission has the responsibility "to present its decisions in a manner amenable to judicial review," *Telephone Users Ass'n v. Public Service Comm'n*, D.C.App., 304 A.2d 293, 300 (1973), cert. denied, 415 U.S. 933, 934, 94 S.Ct. 1448, 39 L.Ed.2d 492 (1974). In this connection, we have held that, absent findings which satisfy certain requirements of the District of Columbia Administrative Procedure Act, D.C.Code 1978 Supp., § 1–1509(e), the case or record must be remanded for further proceedings. *Id.* at 301; *see Chesapeake & Potomac Telephone Co. v. Public Service Comm'n*, D.C. App., 339 A.2d 710, 712–14 (1975). Otherwise, we shall not be able to meet our review responsibilities under §§ 43–705, –706. This court, sitting en banc, has acknowledged that the Commission, in this case has not yet met the "rational connection" requirement under § 1–1509(e). 393 A.2d at 85; *Potomac Electric Power Co. v. Public Service Comm'n*, D.C.App., 402 A.2d 14 at 20 n.5 (1979) (en banc). *See generally Citizens Association of Georgetown, Inc. v. District of Columbia Zoning Comm'n*, D.C. App., 402 A.2d 36 at 40–42, 43 & n.13 (1979).

2. The dissent criticizes the majority opinion for referring to "comparative stock prices" instead of "comparative rates of return" in discussing the Commission's use of a discounted cash flow (DCF) analysis. As used in this context, these respective terminologies reflect the same concern: the minimum yield (reflected in the rate of return and/or the stock price) essential to continue attracting capital to the business, and thus to assure the company's financial integrity. Accordingly, the dissent does not affect the

---

22. At page 32 of its Order No. 5833, the Commission appears to adjust Mr. Glassman's 13.4% result to 13.09% because he erroneously applied his flotation cost to both the growth and yield components, whereas the Commission applies it only to the yield component. Yet at page 37, the Commission purports to adopt the unadjusted figure. If this adoption was erroneous, the 9.25% overall, *see* order at 38, would appear to require reduction before the record is retransmitted for our further review.

23. In an earlier decision, the Commission imposed, on WGL's ratepayers, certain losses resulting from the disposition of WGL's "Brandywine" property. The majority of the court in this case held "that the Commission's *Brandywine* decision is irrelevant to this proceeding . . . ." 393 A.2d at 87 n.17.

thrust of the majority's analysis and holding. On remand, the Commission has to decide (1) how, as a general rule, gains on land transactions shall be allocated, (2) what the impact in this case will be, if any, on the customer rate schedule, and (3) whether that impact will have any effect on the overall rate of return. It must also explain the reasoning behind each of these decisions.

We adhere to our position that "the overall rate of return is not directly at issue," 393 A.2d 79, and that the specific question, therefore, "is whether a portion of each company's prescribed returns should be deemed already paid" by returns on the land transactions. *Id.* This question cannot be answered, however, without deciding how gains on land which were formerly

part of the rate base are related to the ratemaking process. 393 A.2d at 85 & n.16, 92–93.* If the Commission's decision on this question affects the overall rate of return, then that rate of return must be altered accordingly. We do not read the dissent to state otherwise.

In summary, because the Commission did not elaborate reasons for exempting the land gains from the ratemaking process, we must remand for clarification.

---

* We do not understand the dissent's characterization of the overall rate of return as a "non-issue." Although, on one set of facts, the question of allocating gains on land transactions to the investors or the ratepayers will not necessarily affect the rate of return, it may be true, on another set of facts, that the allocation of such gains would have a depressing or enhancing effect on the company's ability to attract capital, thereby calling for an adjustment in the rate of return. *Id.* at 92.