WASHINGTON PUBLIC INTEREST ORGANIZATION, et al., Petitioners,

v.

PUBLIC SERVICE COMMISSION of the District of Columbia, Respondent,

Washington Gas Light Company, Intervenor.

PEOPLE'S COUNSEL, Petitioner,

v.

PUBLIC SERVICE COMMISSION of the District of Columbia, Respondent,

Washington Gas Light Company, Intervenor.

WASHINGTON PUBLIC INTEREST ORGANIZATION, et al., Petitioners,

v.

PUBLIC SERVICE COMMISSION of the District of Columbia, Respondent,

Potomac Electric Power Company, Intervenor.

Nos. 11780, 11786 and 12017.

District of Columbia Court of Appeals.

June 3, 1982.

Gilbert Hahn, Jr., Washington, D. C., was on brief for petitioners in Nos. 11780 and 12017.

Brian Lederer, Elizabeth A. Noel, Robert C. McDiarmid, Washington, D. C., Ron M. Landsman, and Scott H. Strauss, Baltimore, Md., were on brief for petitioner in No. 11786.

Lloyd N. Moore, Jr., Montgomery, Ala., Michael deHaven Newsom, Birmingham, Ala., and Michael E. Geltner, Washington, D. C., were on brief for respondent in Nos. 11780, 11786, and 12017.

Lewis Carroll and Zoe Bush, Birmingham, Ala., were on brief for intervenor in Nos. 11780 and 11786.

Edward A. Caine, Allen C. Barringer, and Betty K. Conley, Washington, D. C., were on brief for intervenor in No. 12017.

Before NEWMAN, Chief Judge, and NEBEKER and FERREN, Associate Judges.

PER CURIAM:

These cases [1] are before us a second time. *See Washington Public Interest Organization v. Public Service Commission,* D.C. App., 393 A.2d 71 (1978), supplemental opinion and dissent, D.C.App., 404 A.2d 541, *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979). They present a single

---

1. The cases concern rate increases granted by the Public Service Commission in 1976 to Washington Gas Light Company (WGL), For- mal Case No. 647, Order No. 5833, and to Potomac Electric Power Company (PEPCO), Formal Case No. 651, Order No. 5831.

issue: when land no longer used in delivering service to the public is sold by a public utility company, should the financial gain—representing appreciation of the property while in service, *i.e.*, while in the "rate base"—accrue to the company's shareholders or to its customers (in the form of reduced utility rates)? *Id.*, 393 A.2d at 72.

When the cases initially were before us, the Commission had ruled that the shareholders alone should benefit from these gains. Its decision rested primarily on the ground that allocation of appreciation on retired land to the shareholders conforms to the mandate of the standard accounting system for utility companies, *i.e.*, the Uniform System of Accounts promulgated by the Federal Power Commission and adopted by our own Commission for use in the District of Columbia. *Id.* We concluded "that the Commission ha[d] not supplied enough facts, coupled with detailed enough reasoning, to justify treatment of the land transactions solely by reference to the Uniform System." *Id.* We therefore "remand[ed] the proceedings for clarification, pursuant to our authority under D.C.Code 1973, § 43–705," and "direct[ed] the Commission

to issue supplementary findings and conclusions, consistent with this opinion, supporting the present or revised rate orders." *Id.* at 93.

The Commission accordingly reopened the proceedings for additional evidentiary hearings, briefing, and argument. *See id.* In its Final Opinion and Order on Remand, No. 7422,[2] the Commission properly ruled, first, that the burden of proof remained with Washington Gas Light Company (WGL) and Potomac Electric Power Company (PEPCO). *See id.*, 393 A.2d at 77. The Commission then turned to what we had characterized as the "unanswered question." *Id.* at 91.

> [W]as the Commission's allocation of the gains to the shareholders related to its announced criteria stressing protection of the companies' financial integrity; or, instead, was it attributable to a normative judgment that the shareholders alone, as owners, have a "right" to the gains? [*Id.* at 91–92.][3]

The Commission concluded:

> The allocation of gains on the land sales to shareholders alone is appropriate rate-

---

2. The Commission issued its Final Opinion and Order on Remand, No. 7422, on December 7, 1981. Therein the Commission adopted its 22-page Proposed Opinion and Order on Remand, No. 7411 (issued October 6, 1981), having reviewed the parties' written comments on that Proposed Opinion and Order.

Commissioners Hankins-Nesbitt (Acting Chairperson) and Clement filed the opinion for the majority. Commissioner Long concurred in the result. He concluded—contrary to the majority—that WGL's and PEPCO's positions could not be sustained on the basis of the discounted cash flow (DCF) analysis or by reference to equitable considerations; but he concluded that the Commission's Order on remand should be upheld, nonetheless, because "the remand in this proceeding indicates that the shareholders bore the risk of loss with respect to the land that was sold," and the courts have been consistent in applying the doctrine that "the benefit should follow the risk."

3. We had elaborated on these two alternatives as follows:

> [1] It may be, apropos of the first alternative, that the Commission, in rethinking the rate structure with reference to company land transactions, would conclude that investors over the years have expected—and

should continue to expect—that ordinary gains on land retired from service will inure to their benefit, and that these expectations have been reflected in the price of stock, with a consequent impact on the companies' ability to attract capital. If this is the case—*i.e.*, if the appreciation accruing on nondepreciable property in the utility's rate base has been fully capitalized into the stock price—then the Commission may conclude that these gains already have inured to the benefit of ratepayers in the sense that the stock price, and thus the company's earnings (including customer payments), are at the lowest justifiable level.

> [2] On the other hand, in facing the question squarely, the Commission may conclude that investors have not had—or in the future should not have—reason to anticipate that ,ney will receive all gains which accrue on nondepreciable property during the period while in the rate base. In that case, the stock price would not reflect allocation of the gains on land to the investors, and the Commission would be faced with essentially an equitable question: whether there exists a justification for the investors to receive the benefit of capital appreciation of rate-base assets, in excess of the return necessary to

making treatment for maintaining the financial integrity of the WGL and PEPCO and establishing rates which are just, reasonable and nondiscriminatory.

We affirm the Commission's ruling.[4]

## I.

The Commission properly noted that if, after remand proceedings, its discounted cash flow (DCF) "analysis were to show that the minimum essential price of common stock presupposes an allocation of all capital gains on land to the shareholders," id., 393 A.2d at 92, then the Commission need not reach the equitable consideration. The Commission, therefore, initially addressed its DCF analysis. It began with a general explanation of what that analysis entails, including discussion of the "growth factor" and the "risk factor." The Commission then noted that witnesses for WGL, PEPCO, and the Commission staff all testified that allocation of the gains on the land to the ratepayers would adversely affect the growth rate in each company's earnings, tending to cause a fall in the common stock price. These witnesses testified, further, that such allocation to the ratepayers (representing an unforeseen, unfavorable change in past practice) would increase the investors' perceived risk, tending to result in an investor demand for a higher rate of return. The Commission summarized its analysis:

> assure the company's financial integrity, without giving any corresponding benefit to the ratepayers.
>
> We are not willing to speculate on what the Commission's position may be on these questions, absent evidence in the record that they have been explicitly and substantially addressed. [Id. at 92; see id., 404 A.2d at 550.]

4. After the Commission filed with this court Order No. 7422, Order No. 7411, and the consolidated proceedings on remand, the petitioners, Washington Public Interest Organization (WPIO) and Office of People's Counsel (OPC), and the intervenors, WGL and PEPCO, filed written responses. Thereafter, the Commission filed a Motion for Leave to Reply to Responses to Orders on Remand. WPIO filed a Motion for Leave to Reply to Any Reply by the Commission to the other parties' responses to

In effect, the evidence presented by the Companies and Staff demonstrated that as a direct result of any reallocation of these land sales gains, the Companies would no longer be able to raise capital at their present cost of capital. As noted by the Court, this result militates against the allocation of the land sales gains to the ratepayers.

The Court ruled that the gain on the land sales must be allocated to shareholders if allocating the gain to the ratepayers requires an offsetting increase in the Companies' rate of return in order to maintain the minimum level required to attract investors. Here, the DCF witnesses have shown that allocating the gain to the ratepayers raises the Companies' cost of equity. As a practical matter, a rise in the Companies' cost of capital would have the same effect as a decrease in the Companies' stock price below the minimum level required to attract capital—an offsetting utility rate increase would be required to meet the increased rate of return demanded by investors.

Accordingly, we conclude that the DCF analysis demonstrates that allocating the gain to the ratepayers would lower the anticipated growth in WGL and PEPCO earnings and increase investors' perceived risks, thereby elevating the rate of return demanded by investors. Further, the increased return demanded by investors would require an increase in utility rates.

the Commission's Final Opinion and Order. WPIO also filed a motion to set a hearing schedule. OPC filed a statement in support of that motion. We have said that after the Commission had filed its findings, conclusions, orders, supporting memoranda, and the record of the proceedings on remand, "the petitioners and intervenors shall file their responses, after which this court will either set the matter for hearing or proceed directly to make its decision." Washington Public Interest Organization, supra, 393 A.2d at 93. We conclude that the submissions contemplated by our previous opinion are responsive, thorough, and sufficient for our review of these cases following the remand. Accordingly, all motions for leave to file replies to the parties' responses, as well as the motion to set a hearing schedule, are denied.

The Commission rejected the testimony of witnesses for the petitioners, Washington Public Interest Organization (WPIO) and the Office of People's Counsel (OPC), to the effect that land sales are "unusual" or "extraordinary" and thus do not affect the companies' stock prices. The Commission found "ample evidence" that "land sales gains occur with considerable regularity with respect to PEPCO's operations," and that such gains are "a recurring phenomena in WGL's experience as well, although to a lesser extent than in PEPCO's case." The Commission concluded, moreover, that even if WGL's land sales gains could not be considered recurring, allocation to ratepayers would reflect "a change in existing policy" that would affect the price of stock adversely, whereas allocation to the shareholders "would tend to increase the market price of stock if the gains were reinvested in utility property." Finally, the Commission found—and elaborated—what it called serious flaws in other testimony by OPC and WPIO witnesses attempting to show that the gains in land sales do not affect WGL and PEPCO stock prices.[5]

The Commission then concluded:

5. The Commission stated:
   In summary, the argument of OPC and WPIO that stock prices are not affected by land sales gains is not supported by the evidence. Both OPC witnesses conceded that recurring land sales gains would affect stock prices, if the gains were significant enough, and the record reflects that each Company routinely engages in sales of land removed from the rate base. To the extent that these land sales in WGL's case are considered usual, Mr. Marquart admitted that the Company's stock prices would be positively affected if these gains were allocated to shareholders and reinvested in utility property. Moreover, to the extent that WPIO's witness expressed an opinion that investors do not rely upon this type of income in evaluating stock prices, this opinion testimony is unconvincing to the Commission.

6. The Commission elaborated:
   The Court identified several equitable factors for consideration if such an analysis were made, namely:
   (i) who provided the capital used to purchase the land;
   (ii) who contributed funds to pay the taxes on the land;

The weight of the reliable and probative evidence bearing on the DCF analysis is sufficient to establish that allocation of the land sales gains to the shareholders of WGL and PEPCO is required in order to provide them with an opportunity to earn the rates of return which were allowed in Orders No. 5833 and 5831 and to maintain the prices of the Companies' stocks above the minimum level necessary to attract and retain investors. Accordingly, it is not necessary under the Court's Decision to proceed further.

As a precautionary measure, however, "to assure full compliance," the Commission "examined the equitable factors" and, after considerable analysis, "conclude[d] that their consideration likewise favors allocation of the land sales gains to the shareholders."[6]

## II.

We need not evaluate the Commission's equitable analysis (which does not self-evidently support the shareholders' position, see note 6 supra), for we are satisfied that the evidence and elaboration supporting the DCF analysis, after remand, are sufficient

(iii) who paid the carrying charges on the land; and
(iv) who bore the risk of loss while the land was in the rate base.
393 A.2d at 91.
   The testimony in this proceeding is conclusive on these factors. The shareholders of WGL and PEPCO provided the capital used to purchase the land. WGL Ex. A at 3; PEPCO Ex. A at 11. The shareholders also bore the risk of loss while the land was in the rate base. Id. . . .
   With respect to payment of carrying charges and taxes on the land, PEPCO and WGL agreed that these items were included in their cost-of-service and thus were paid by the ratepayers. . . .
The Commission distinguished the Brandywine and Douglas Point situations, as well as the Maryland Public Service Commission proceeding that allocated gains on WGL land sales to the ratepayers. The Commission noted that in the Maryland case, "the ratepayers had paid all of the operating costs associated with the land . . . in stark contrast with the instant matter where the record reflects that the ratepayers have not paid all of the operating costs associated with the land."

to require us to sustain the Commission's ruling. In discussing this court's scope of review under D.C.Code 1973, § 43–706 (recodified as D.C.Code 1981, § 43–906), we have stated: "As long as there is substantial evidence to support a reasoned conclusion of the Commission we must affirm." *Potomac Electric Power Company v. Public Service Commission,* D.C.App., 402 A.2d 14, 18 (1979) (en banc); *accord, Washington Public Interest Organization, supra,* 393 A.2d at 75–77. We cannot gainsay the Commission's conclusion which is—in contrast with the original proceeding—responsive to the concerns expressed in our remand order (*see* note 3 *supra*):

The evidence establishes that investors have expected and will continue to expect that gains from sales of land removed from the rate base will inure to the shareholders' benefit. These expectations have been fully taken into account in the prices that investors pay for the stock of WGL and PEPCO, and consequently, a change in the allocation of these gains from the shareholders to the ratepayers would adversely affect the ability of WGL and PEPCO to attract capital at reasonable rates and cause a fall in stock prices. In short, the DCF analysis demonstrates that allocating the gains to the ratepayers would lower the growth in WGL's and PEPCO's earnings, increase investors' perceived risks and raise the rate of return demanded by investors. Further, increased return demanded by investors would ultimately require an increase in utility rates, which would effectively negate any benefit conferred upon ratepayers in allocating land sales gains to them.

The Commission's Order No. 7422 is accordingly

*Affirmed.*

NEBEKER, Associate Judge, concurring in result:

I concur in the result. *See* my dissent to the remand decision herein, *Washington Public Interest Organization v. Public Service Commission,* D.C.App., 404 A.2d 541 (1979).